[Civ. No. 3214. Second Appellate District, Division Two.—September 29, 1920.]

MILTON A. FLY, Appellant, v. JOHN C. CLINE, as Sheriff, etc., et al., Respondents.

[1] JUDGMENT—REAL PROPERTY CONVEYED IN FRAUD OF CREDITORS—IN-NOCENT PURCHASER FROM FRAUDULENT GRANTEE—RIGHTS OF PAR-TIES—REDEMPTION.—A judgment lien is not acquired as to real property conveyed by the judgment debtor prior to the docketing of the judgment so as to give the judgment creditor the right of redemption of the property from a purchaser at a mortgage fore-closure sale, where the record owner at the time of such docketing was not made a party to the action and was an innocent purchaser in good faith, although the property had been conveyed by the judgment debtor for the purpose of defrauding creditors.

[2] VENDOR AND VENDEE—PURCHASER FOR VALUE—PRESUMPTION. — A purchaser for value is presumed *prima facie* to be an innocent purchaser in good faith.

[3] FRAUDULENT CONVEYANCE—VALIDITY BETWEEN PARTIES.—A con-veyance in fraud of creditors although declared by statute to be void as to them, is valid as between the parties.

[4] ID.—BONA FIDE PURCHASER FROM FRAUDULENT GRANTEE—STATUS. A *bona fide* purchaser from the fraudulent grantee takes the title even against the creditors of the fraudulent grantor, purged of the anterior fraud that affected the title.

[5] VENDOR AND VENDEE—DEED INTENDED AS MORTGAGE—CONVEYANCE TO INNOCENT PURCHASER—STATUS.—Where a conveyance intended as security is absolute on its face, and the land is subsequently conveyed to an innocent third person, who pays the purchase money, or renders a valuable consideration, without notice of the

true character of the conveyance, his title cannot be disturbed by any claim that the original transaction was a mortgage and not an absolute conveyance.

[6] MECHANIC'S LIEN—RECORD OWNER NOT A PARTY—DECREE.—A decree of foreclosure of a mechanic's lien in an action in which the record owner of the property is not a party is not *res adjudicata* in a subsequent action between the lien claimant and such owner.

[7] CONTRACT—AGREEMENT TO EXECUTE BUILDING CONTRACT—RIGHTS OF CONTRACTOR.—An agreement of an owner "to give" to a contractor a contract to construct an apartment house "to have about fifty-four apartments of two and three rooms each and the cost not to exceed forty-five thousand dollars," did not employ the contractor to do any work on the proposed house or to furnish any material whatever.

[8] ID.—AGREEMENT FOR FUTURE CONTRACT—RULE.—Where the minds of the parties have met respecting the terms and conditions of the more formal writing that is to be executed by them, and the agreed terms of the contract thereafter to be executed are certain and in all respects definitely understood and agreed upon in advance, either orally or by informal writing, there is an obligatory contract dating from the making of the earlier agreement, but unless the agreement to execute the future contract is definite and certain so that nothing is left for future negotiation, the agreement is nugatory.

[9] MECHANIC'S LIEN—PREPARATORY CONSTRUCTION WORK—TIME FOR FILING CLAIM OF LIEN.—A contractor who did work preparatory to the construction of a building under an agreement with the owner claimed by him to be a building contract was not entitled, under section 1187 of the Code of Civil Procedure, to sixty days after the completion of the building by another contractor under another contract within which to file his claim of lien, but was required to file such claim within the statutory period after the completion of his own work.

[10] ID.—SEPARATE CONTRACTS—TIME FOR FILING LIENS.—Where labor or materials are furnished under separate building contracts, even though such contracts are between the same persons and relate to the same building or employment, the contracts cannot be tacked together so as to enlarge the time for filing a lien for what was done or furnished under either, but the claim of lien must be filed for what was done or furnished under each contract within the statutory period after its completion.

APPEAL from a judgment of the Superior Court of Los Angeles County. Russ Avery, Judge. Affirmed.

The facts are stated in the opinion of the court.

Wm. Lewis for Appellant.

R. L. Horton for Respondents.

FINLAYSON, P. J.—Several actions in the superior court were consolidated and tried as one. The trial resulted in a judgment adverse to Milton A. Fly, the appellant. The controversy presents the question as to whether appellant had the right to redeem the property, a lot in the city of Los Angeles, from a redemption previously made by the Hammond Lumber Company.

The facts necessary to an understanding of the questions presented by the appeal are these:

On February 26, 1913, Della Ingerson, the then owner of the premises, mortgaged the property to the Security Trust & Savings Bank to secure her promissory note for $2,500.

Desiring to erect an apartment house on the premises, Mrs. Ingerson, on April 28, 1913, entered into the following written agreement with appellant:

"Los Angeles, Cal., April 28th, 1913.

"Memorandum of agreement made and entered into by and between Mrs. Della Ingerson, party of the first part, and Milton A. Fly, party of the second part, both of Los Angeles, California. The party of the first part agrees to give to the party of the second part a contract for the construction of one brick apartment house to be located at 230 South Beaudry avenue, fourth lot north of Third Street, east side of Beaudry avenue, Los Angeles, California, being Lot 15, Block 8 of the Woolen Mill Tract. Said apartment house to have about fifty-four apartments of two and three rooms each and the cost not to exceed $45,000. The party of the first part hereby authorizes the party of the second part to order blue print plans and specifications for the party of the first part, and also to arrange for a building loan at 5½% or 6%, the lot to be clear of incumbrance. This agreement signed in duplicate this 28th day of April, 1913.

"Mrs. Della Ingerson.
"Milton A. Fly."

About three months later plans for an apartment house, to cost about $65,000, were prepared by an architect.

On November 6, 1913, Mrs. Ingerson executed a second mortgage on the property to Watson B. Burt, as mortgagee, to secure her promissory note, of even date, for $45,000. This mortgage, hereafter referred to as the Burt mortgage, was recorded November 27, 1913, and later was assigned to the Hammond· Lumber Company.

On December 29, 1913, Mrs. Ingerson entered into a building contract with the Dutro-Wren Construction Company, as contractor, for the construction of an apartment house upon the premises. By this contract, which was a formal written building contract, the contractor, the Dutro· Wren Construction Company, agreed to construct on the lot, pursuant to the previously prepared plans, a three-story, class C, brick apartment house, and Mrs. Ingerson agreed to pay therefor the sum of $65,000. Fly was not a party to nor mentioned in this building contract. Work under this contract was commenced by the Dutro-Wren Construction Company about January 19, 1914, and was continued by the contractor until October 13, 1914, on which day work on the apartment house ceased, and was not resumed until more than thirty days thereafter.

On March 2, 1914, Mrs. Ingerson executed a grant deed to the premises to her attorney, George H. Woodruff. This deed to Woodruff was recorded in the office of the county recorder on the day of its execution. On December 9, 1914, Woodruff and wife executed to Ada Webster, the daughter of Mrs. Ingerson, a quitclaim deed to the premises. This deed was recorded December 10, 1914. One of the claims made by appellant is that Mrs. Ingerson's deed to Woodruff and the latter's deed to Mrs. Webster were made to hinder, delay, and defraud Mrs. Ingerson's creditors; or, if not made for that purpose, then that the deed to Woodruff was given as security, to secure any indebtedness that thereafter might become due him from his client, Mrs. Ingerson, and that, therefore, it was but a mortgage.

On February 24, 1916, Mrs. Webster, who, on the face of the records in the county recorder's office, was the then absolute owner of the property, conveyed it, for a valuable consideration, to W. H. Elliott, by grant deed recorded February 25, 1916; and Elliott and wife, for a valuable consideration, by a grant deed bearing date February 25, 1916, conveyed the property to the Hammond Lumber Company,

which corporation now claims to be the owner of the premises.

On December 5, 1914, Fly, claiming that he had performed work in the construction of the apartment house under his memorandum agreement with Mrs. Ingerson of date April 28, 1913, a copy of which is set forth *supra,* filed in the office of the county recorder a mechanic's lien claim for $4,414.38. On December 29, 1914, he commenced an action in the superior court to foreclose his alleged mechanic's lien. He made Mrs. Ingerson and her immediate grantee, Woodruff, parties defendant; but Mrs. Webster, though then appearing of record as the sole owner, was not made a party to the action. Because Mrs. Webster was not made a party to Fly's action to foreclose his alleged mechanic's lien, the decree in that action is not *res adjudicata* as to her or as to either of her successors in title—Elliott and the Hammond Lumber Company. On February 1, 1917, a foreclosure decree was entered in that action, whereby the court declared that Fly had a mechanic's lien on the property for $4,414.38, and decreed that the lien be enforced by sale of the premises.

On June 1, 1915, the Security Trust & Savings Bank, the holder of the first mortgage—the mortgage for $2,500—commenced a foreclosure action in the superior court, making parties defendant Mrs. Ingerson, the Dutro-Wren Construction Company, the Hammond Lumber Company, Ada Webster, and a number of mechanic's lien claimants. This foreclosure suit resulted in a decree whereby it was adjudged, among other things, that $3,068.75 was due the plaintiff in that action, the Security Trust & Savings Bank, on the $2,500 mortgage that Mrs. Ingerson had executed to it February 26, 1913; that $45,000, with interest, was due the Hammond Lumber Company on the Burt mortgage that had been assigned to it; that the premises be sold, and that the proceeds of the sale, after payment of sheriff's fees, etc., be applied, first to the payment of the amount due the Security Trust & Savings Bank on the mortgage held by it, and then, if there should be any surplus, to the payment of the Hammond Lumber Company's claim for $45,000, and interest, due on the Burt mortgage. By this decree the court made no attempt to pass upon the validity of Fly's claim of lien. That is a matter that was not passed upon or determined.

On March 22, 1916, at the sheriff's sale under the foreclosure decree in the action thus brought by the Security Trust & Savings Bank to foreclose the mortgage held by it, the property was sold by the sheriff to the judgment creditor, the Security Trust & Savings Bank, for $3,195.19, which, after paying the sheriff's fees and the amount due the judgment creditor, left no surplus whatever. Thereupon a certificate of sale was executed and delivered to the purchaser.

The next day, March 23, 1916, the Hammond Lumber Company, by whom the $45,000 mortgage was held, and who, in the foreclosure action that had been brought by the Security Trust & Savings Bank to foreclose its $2,500 mortgage, had been adjudged to be the holder of the $45,000 mortgage, claiming the rights of a redemptioner, paid the purchaser at the sheriff's sale, the Security Trust & Savings Bank, the amount that it had paid the sheriff for the property, $3,195.19, with interest thereon at one per cent per month. At the same time, the Hammond Lumber Company gave the sheriff written notice of redemption, accompanied by a copy of the docket of the judgment in the mortgage foreclosure action wherein the court had adjudged the Hammond Lumber Company to be the holder of the $45,000 mortgage. The Hammond Lumber Company also presented to the sheriff an affidavit showing the amount that it claimed to be due to it on the "judgment lien" which it claims was created by the docketing of the decree in the mortgage foreclosure action. On March 24, 1916, the sheriff executed and delivered to the Hammond Lumber Company a certificate of redemption. Thereafter, on the expiration of a year, the sheriff executed a sheriff's deed to the Hammond Lumber Company, and, as we have said, that corporation now claims to be the absolute owner of the property.

In addition to the action that he had commenced on December 29, 1914, to foreclose his alleged mechanic's lien, Fly, on February 16, 1916, brought an action of debt against Mrs. Ingerson to recover for work and labor that he claims to have performed in the construction of the apartment house under the written memorandum agreement that he and Mrs. Ingerson had entered into on April 28, 1913. The sole party defendant in that action was Mrs. Ingerson, who

did not appear, and, on March 3, 1916, a default judgment was entered against her by the clerk for $4,414.38.

On May 22, 1916, Fly, claiming that the Hammond Lumber Company's redemption was fatally defective in certain particulars which we have not deemed it necessary to mention, and that, by reason of such defects, that company had not acquired any right as a "redemptioner," but that its sole right was that of an equitable assignee of such right to the property as the Security Trust & Savings Bank had acquired as the original purchaser at the sheriff's sale, undertook to redeem the property by tendering to the sheriff, for the Hammond Lumber Company, the amount that the latter had paid the Security Trust & Savings Bank, viz., $3,325.67, with interest thereon at two per cent per month, and no more. This attempted redemption by Fly was based on the mechanic's lien that he claimed to have acquired by the filing of his mechanic's lien claim in the county recorder's office on December 5, 1914, and also on the judgment lien that he claimed to have acquired by the docketing of the personal judgment against Mrs. Ingerson in the action of debt that he had brought against her. The sheriff, treating the Hammond Lumber Company as one who had become a "redemptioner," with all the statutory rights of a redemptioner, refused to receive the tendered sum of $3,325.67, with interest thereon at two per cent per month, on the ground that it was not accompanied by the amount due on the Burt mortgage held by the Hammond Lumber Company, namely, $45,000 and interest thereon.

On March 21, 1917, a judgment, purporting to be a judgment foreclosing appellant's alleged mechanic's lien, having been entered on February 1, 1917, and docketed February 19, 1917, appellant again attempted to redeem the property by again tendering to the sheriff, for the Hammond Lumber Company, the amount which the latter had paid the original purchaser at the sheriff's sale. Fly based this second attempted redemption on his alleged mechanic's lien and on the decree foreclosing the same, docketed February 19, 1917. Again the sheriff refused Fly's tender of payment. This refusal was on the same ground as before, namely, that the amount tendered should have included the sum due the Hammond Lumber Company on the Burt mortgage.

From these facts various propositions are advanced and argued. "The whole contention in this court," says appellant in his closing brief, "is relegated to the question of the sufficiency of the tenders of redemption made to the sheriff by appellant, Milton A. Fly, and respondent Hammond Lumber Company, and their respective rights as such redemptioners."

Under the view we take of the case, it will not be necessary to consider appellant's claim that the Hammond Lumber Company did not acquire the rights of a "redemptioner" and that it is only an equitable assignee of the rights acquired by the Security Trust & Savings Bank as the original purchaser at the sheriff's sale. This is so for the reason that, as we view the case, appellant himself never became vested with the rights of a redemptioner. And if, as we hold, appellant's attempted redemptions were without authority of law and abortive, then, for that reason alone, the judgment must be affirmed.

For the purpose of this appeal, we shall assume that the possessor of a mechanic's lien has the same right to redeem as has the holder of a mortgage lien, although the language of subdivision 2 of section 701 of the Code of Civil Procedure would seem to confine the right of redemption to "a creditor having a lien by judgment or *mortgage.*" This assumption that the possessor of a mechanic's lien may exercise the right of redemption finds some support in the fact that subdivision 1 of section 705 makes reference to a redemption upon "a mortgage or *other* lien." If we assume, for the purposes of this appeal only, that the possessor of a mechanic's lien is entitled under our code to redeem property that has been sold at sheriff's sale, then, in order to entitle appellant to invoke the rights possessed by a redemptioner, it must appear that he had either: (1) a lien by judgment; or (2) a mechanic's lien. No other form of lien is claimed by him. In our opinion, appellant never acquired either of such liens.

[1] Appellant did not acquire a judgment lien: The personal judgment against Mrs. Ingerson, entered March 3, 1916, in favor of appellant, in the action of debt that he had commenced against her on February 16, 1916, did not create a judgment lien on the property in controversy, for the reason that, when that judgment was docketed, March 9, 1916, the title to the property was not in Mrs. Ingerson,

the judgment debtor and sole party defendant in that action, but was in the Hammond Lumber Company under its deed from Elliott and wife, of date February 25, 1916. The decree that was entered in the suit that Fly brought to foreclose his alleged mechanic's lien was not entered until February 1, 1917—long after the Hammond Lumber Company had become the record owner under its deed from Elliott, who, it will be remembered, deraigned title from Mrs. Webster, who, in her turn, was the grantee of Woodruff, to whom Mrs. Ingerson, the original owner, had conveyed the property by deed dated March 2, 1914. At the time when Fly brought his action to foreclose his alleged mechanic's lien, December 29, 1914, the record title stood in Mrs. Webster, under the deed to her from Woodruff and wife, dated December 9, 1914, and recorded December 10, 1914. Mrs. Webster, though appearing of record as the owner of the property at the time when appellant brought his action to foreclose his alleged mechanic's lien, was not made a party to that action. Therefore, neither she nor either of her successors in title is bound by that decree. Unless, therefore, it can successfully be claimed that, at the date of the docketing of one, at least, of these two judgments in favor of Fly, Mrs. Ingerson was the owner of the property, or, at least, had an interest therein to which a judgment lien could attach, there can be no basis for any claim that appellant ever possessed a redemptioner's status as a creditor having a lien by judgment.

To support his claim that, at the times when he sought to redeem the property from the sheriff's sale, Mrs. Ingerson was the true owner of the property, and that, therefore, he had a judgment lien when he thus sought to effect a redemption, appellant contends that the deed from Mrs. Ingerson to Woodruff, and likewise the deed from Woodruff and wife to Mrs. Webster, were made to hinder, delay, and defraud the creditors of Mrs. Ingerson; or that, if those deeds were not made for that purpose, then the deed to Woodruff was made as security for such indebtedness, if any, as might become due to him from Mrs. Ingerson during such time as he might act as her attorney, and that, therefore, the deed to Woodruff was but a mortgage. Neither of these contentions, if borne out by the evidence, could aid appellant; for the respondent Hammond Lumber Company,

and its immediate grantor, W. H. Elliott, were both innocent purchasers. As to each of these grantees, therefore, the title, as it appeared of record at the dates of the respective deeds to them, must be treated, in so far as their rights are concerned, as the true title to the property. That is, as to the Hammond Lumber Company and its immediate grantors, W. H. Elliott and wife, the record chain of title must be taken as correct, and, as to each of them, Mrs. Webster must be regarded as the only true legal and equitable owner from the date of Woodruff's deed to her, December 9, 1914, down to the date of her conveyance to Elliott, February 24, 1916. This is so because the Hammond Lumber Company and W. H. Elliott were purchasers for value without notice. It appears from the evidence that both Elliott and the Hammond Lumber Company gave a valuable consideration for the property. [2] A purchaser for value is presumed, *prima facie*, to be an innocent purchaser in good faith. (*Williams* v. *Borgwardt*, 119 Cal. 80, [51 Pac. 15]; *Morrow* v. *Graves*, 77 Cal. 218, [19 Pac. 489].) There is nothing in the evidence to rebut this presumption.

If it be true that, as claimed by appellant, the deed from Mrs. Ingerson to Woodruff and the deed from Woodruff and wife to Mrs. Webster were made to hinder, delay, and defraud Mrs. Ingerson's creditors, each deed, though void as to such creditors, was good as between the parties thereto; and Elliott and the Hammond Lumber Company, as innocent purchasers for value, took the title discharged of any fraud with which it may have been infected. [3] It is the settled doctrine that a conveyance in fraud of creditors, although declared by statute to be void as to them, is, nevertheless, valid as between the parties; [4] and a *bona fide* purchaser from the fraudulent grantee takes the title, even against the creditors of the fraudulent grantor, purged of the anterior fraud that had affected the title. (*Paige* v. *O'Neil*, 12 Cal. 484; *Morrow* v. *Graves, supra; Williams* v. *Borgwardt, supra; Denike* v. *Santa Clara etc. Soc.*, 9 Cal. App. 229, 232, [98 Pac. 687].)

If, as claimed by appellant, the deed to Woodruff, though absolute in form, was intended as a mortgage given to secure a possible future indebtedness from Mrs. Ingerson to Woodruff, the result will be the same as if the deed were, in fact, what on its face it purported to be—an absolute con-

veyance. [5] For the rule is that where a conveyance, intended as security, is absolute on its face, and the land is subsequently conveyed to an innocent third person, who pays the purchase money, or renders a valuable consideration, without notice of the true character of the conveyance, his title cannot be disturbed by any claim that the original transaction was a mortgage and not an absolute conveyance. Such purchaser is protected by the provisions of sections 2925 and 2950 of the Civil Code, and becomes the real owner of the property. (*Pico* v. *Gallardo,* 52 Cal. 206; *Carpenter* v. *Lewis,* 119 Cal. 18, [50 Pac. 925].)

For these reasons we conclude that, at the time when the clerk docketed the personal judgment against Mrs. Ingerson in Fly's action of debt against her, and likewise at the time when the decree purporting to foreclose Fly's mechanic's lien was docketed, the title to the property was not in the judgment debtor, Mrs. Ingerson; or, at any rate, so far as the rights of respondent Hammond Lumber Company are concerned, the title cannot be regarded as being in the judgment debtor at those times, nor at any time since then, but must be taken to have been vested at each of those times in the person in whom it appeared on the face of the recorded chain of title. We think it clear, therefore, that appellant never had the status of a redemptioner having a lien by judgment.

[6] Appellant was not entitled to redeem as the possessor of a mechanic's lien: The only judgment to which our attention has been called that purports to establish appellant's status as a mechanic's lien claimant is that given and made in the action brought by him to foreclose his alleged lien. The then record owner of the title was Mrs. Webster, who, as we have seen, must be regarded as the true owner at that time, in so far as the respondent Hammond Lumber Company's rights are affected. She was not made a party to appellant's action to foreclose his alleged mechanic's lien. The foreclosure decree in that action is, therefore, not *res adjudicata* in any action between appellant and Mrs. Webster, or between appellant and Mrs. Webster's successor in title, the Hammond Lumber Company. For this reason the court below, if the evidence adduced before it warranted, was justified in finding, as it did, that appellant never had a mechanic's lien, anything in the decree in the action that

appellant had brought to foreclose his alleged mechanic's lien to the contrary notwithstanding.

[7] The finding that appellant never acquired a lien under the mechanic's lien law is amply supported by the evidence. Appellant testified that the only contract he ever had with the owner, Mrs. Ingerson, to do any work on the building was the written memorandum agreement of April 28, 1913, a copy of which is set forth, *supra;* and this was the only contract of employment relied upon by appellant in the claim of lien that he filed in the recorder's office. By this memorandum agreement of April 28, 1913, Mrs. Ingerson did not employ appellant to do any work on the proposed apartment house or to furnish any material whatever. Its language, so far as pertinent, is: ''The party of the first part [Mrs. Ingerson] agrees to give the party of the second part [appellant] a contract for the construction of one brick apartment house. . . . Said apartment house to have *about* fifty-four apartments of two and three rooms each and the cost *not to exceed* $45,000.'' This agreement was not a contract by appellant to construct the apartment house for which plans were subsequently drawn and which later was erected upon the premises; nor was it a contract on the part of the then owner, Mrs. Ingerson, employing appellant to construct a definite and certain structure. It was nothing more than an agreement on the part of Mrs. Ingerson to thereafter enter into and execute a building contract with appellant. To employ the language of the instrument itself, it was an agreement on Mrs. Ingerson's part *"to give"* to appellant a contract for the construction of a brick apartment house. It was not a building contract; only an agreement to execute a building contract.

But, says appellant, an agreement to make and execute a certain written contract, the terms of which are mutually understood and agreed upon, is in all respects as valid and obligatory as would be the contract which it was agreed should be executed. The vice of appellant's contention is that the principle invoked by him, though unquestionably sound, is not applicable here, for the reason that the memorandum agreement of April 28, 1913, is fatally uncertain respecting the terms and conditions of the proposed building contract, particularly as to the structural details of the proposed apartment house. It may be conceded that where the minds of the parties have met respecting the terms and con-

ditions of the more formal writing that is to be executed by them, and the agreed terms of the contract thereafter to be executed are certain and in all respects definitely understood and agreed upon in advance, either orally or by informal writing, there is in such case an obligatory contract dating from the making of the earlier agreement. (13 C. J., p. 290 et seq.) [8] But it also is elementary law that, unless the agreement to execute the future contract be definite and certain upon all the subjects to be embraced, so that nothing is left for future negotiation, it is nugatory. (*St. Louis & S. F. R. Co.* v. *Gorman,* 79 Kan. 643, [28 L. R. A. (N. S.) 637, 100 Pac. 647].) In the instant case the memorandum agreement of April 28, 1913, is fatally indefinite and uncertain as to essential structural particulars and likewise as to the price to be paid for the erection of the building. At the date of its execution, April 28, 1913, no plans or specifications had been prepared. The agreement does not state whether the proposed apartment house shall be a structure of one story or of many stories. It does not state how many separate apartments the proposed apartment house shall contain. The language of the instrument is: "Said apartment house to have *about* fifty-four apartments of two and three rooms each." How many of the apartments were to consist of two and how many of three rooms is a matter that the parties left undetermined, and, therefore, a subject for future negotiation. Nor was there any definite meeting of minds as to the contract price of the proposed building. The only agreement respecting the cost of the structure was that "the cost [is] not to *exceed* $45,000." But whether the cost was to be $45,000, or less, and if less, how much less, was left *in nubibus.* As a matter of fact, the building that the owner finally determined to erect, and for which plans subsequently were drawn, was a structure that it was estimated would cost $65,000. This alone might suffice to show that when appellant and Mrs. Ingerson made their memorandum agreement of April 28, 1913, their minds had not met as to the exact size and character of the apartment house that was to be built. Clearly, this agreement of April 28, 1913, considered as a construction contract, was fatally uncertain, and no right as a building contractor could possibly vest thereby in appellant. It cannot be construed as an agreement by the owner employing appellant to do any work on her premises

or on the apartment house that she contemplated building but for which no definite plans had as yet matured.

[9] Moreover, if appellant was ever entitled to a lien for any amount whatever, his claim of lien was not filed for record within the time provided by statute. It is not claimed that he furnished any material on the building; and there is ample evidence to support the court's finding that he never performed any labor or bestowed any skill or other necessary services contributing to the construction of the apartment house after the contract for its erection was made by the owner with the Dutro-Wren Construction Company. O. W. Dutro, who testified that he had complete supervision of the construction of the apartment house under the contract that the Dutro-Wren Construction Company had made with Mrs. Ingerson, and that he was on the work at all times after its commencement, testified that he never saw appellant do any work on the building or in anywise superintend its construction. This testimony was corroborated by that of a number of other witnesses. Appellant's reply to this is that the evidence shows that he did some work in connection with the grading of the lot and the removal of the trees—work which he says was of the nature of necessary preparatory work performed prior to the execution of the contract with the Dutro-Wren Construction Company for the erection of the apartment house. Even so, appellant must fail in his claim that he acquired a mechanic's lien, for he did not file his claim of lien for record until long after the expiration of sixty days from the completion of such preparatory work. It may be conceded that if preparatory work of the nature of that which appellant claims to have performed be included in the building contract, the claim of lien may be filed for record, under section 1187 of the Code of Civil Procedure as it stood at the time this work was completed, within sixty days after the completion of the building contract, if filed by the original contractor, or within thirty days after such completion, if filed by a subcontractor, materialman, or laborer. But here the preparatory work of grading and clearing the lot, etc., was not included in the contract that the owner made with the contractor for the erection of the apartment house—the contract with the Dutro-Wren Construction Company. The work of grading and clearing the lot, removing the trees,

etc., had been wholly completed, under a contract made with one Hicks, some time before the owner made her contract with the Dutro-Wren Construction Company. Whatever the contract with Hicks for this preparatory work may have been, the work thereunder was performed under a contract entirely separate from and independent of the contract that subsequently was made with the Dutro-Wren Construction Company. [10] Where labor or materials are furnished under separate building contracts, even though such contracts are between the same persons and relate to the same building or employment, the contracts cannot be tacked together so as to enlarge the time for filing a lien for what was done or furnished under either. The claim of lien must be filed for what was done or furnished under each contract, within the statutory period after its completion.

For the reasons already given, it must be held that the memorandum agreement of April 28, 1913, because of its uncertainty and incompleteness as to almost all essential structural matters, as well as the cost of construction, cannot be regarded as a contract employing appellant to do any work of any kind upon an apartment house the plan of which then lay in the womb of the future. The preparatory work that appellant claims to have done was not provided for by the contract that Mrs. Ingerson made with the Dutro-Wren Construction Company. It was done under a separate and distinct contract—a contract that was fully completed on November 5, 1913, on which day, according to appellant's testimony, the work of grading the lot, removing the trees, etc., was finished. When, therefore, the contract for such preparatory work was completed, all the laborers who performed any labor thereunder should have filed their lien claims not later than thirty days after its completion, i. e., within thirty days after November 5, 1913; and the original contractor should have filed his lien claim within sixty days thereafter. Appellant did not file his claim of lien in the recorder's office until December 5, 1914—thirteen months after the completion of the contract for the work that he designates as necessary preparatory work.

For the foregoing reasons we are satisfied that when appellant attempted to redeem the property, and, for that purpose, tendered to the sheriff the amount that the respondent Hammond Lumber Company had paid to the original pur-

chaser at the sheriff's sale, with interest thereon at two per cent per month, he had neither a judgment lien nor a mechanic's lien, and, therefore, was not a "redemptioner," and consequently not entitled to redeem the property, regardless of whether the Hammond Lumber Company had acquired its interest as a redemptioner or only as an equitable assignee of the Security Trust & Savings Bank.

Judgment affirmed.

Thomas, J., and Weller, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 24, 1920.

All the Justices concurred.