[Civ. No. 7016.   Third Dist.   Oct. 31, 1944.]

R. H. GIBSON et al., Appellants, v. DE LA SALLE INSTI-
TUTE (a Corporation), Respondent.

Edward T. Taylor for Appellants.

Rogers & Clark, John H. Painter and John W. Broad for Respondent.

ADAMS, P. J.—On March 23, 1943, plaintiffs, appellants before this court, filed a complaint against defendant De La Salle Institute the pertinent allegations of which were that on February 25, 1943, defendant was possessed of 500,000 gallons of wine including 275,000 gallons of sherry, 80,000 gallons of muscatel, 45,000 gallons of port, 50,000 gallons of dry red, and 50,000 gallons of dry white; that on said date and as a culmination of negotiations between plaintiffs and defendant, defendant offered to sell to plaintiffs the above described wines at specified prices, which offer was transmitted to plaintiffs by telegram reading:

"NAPA CALIF  FEB 25 1943
"GIBSON WINE CO.  ATTN R H GIBSON
200 WEST MACMECKEN AVE
CINCINNATI OHIO
FIND IT NECESSARY TO ASK FOR FOLLOWING PRICES 275,000 GALLONS SHERRY .85 STOP  80,000 GALLONS MUSCATEL .90 STOP  45,000 GALLONS PORT .85 STOP  50,000 GALLONS DRY RED .50 STOP  50,000 GALLONS DRY WHITE .70 STOP OR AN AVERAGE PRICE OF .80 PER GALLON ON THE ABOVE 500,000 GALLONS TERMS CASH BUT CAN SUPPLY WAREHOUSE RECEIPTS ON 250,000 GALLONS STOP PLEASE WIRE TODAY IF INTERESTED AND SAMPLES AND SALES CONTRACT WILL GO FORWARD
MONT LASALLE VINEYARDS BROTHER JOHN
"923A  FEB 26.  275,000  .85  80,000  .90  45,000  .85  50,000  .50  50,000  .70  .80  500,000  250,000  RWUA 44GE"

That plaintiffs accepted said offer by telegram and contracted to buy said products offered at the prices and upon the terms offered; that by telephone conversation between plaintiff R. H. Gibson and the general manager of defendant, Stanley Hoffman (whose religious name is Brother John), plaintiffs waived and dispensed with the forwarding of samples and offered to send or pay cash to defendant at any place or time designated by defendant, and that subsequent to said 25th day of February in a telephone conversation between R. H. Gibson and Stanley Hoffman, the latter requested Gibson to come to California to take delivery of said wine; that Gibson thereafter came to California from Ohio for the purpose of paying for and taking delivery of said wine, but upon his arrival on or about March 16th was advised by said Stanley Hoffman that defendant would not deliver said wine

as he had changed his mind. Plaintiffs prayed for specific performance or for damages if such performance could not be had.

Defendant answered this complaint and admitted that Hoffman sent the telegram described in plaintiffs' complaint, and alleged that Gibson answered same by a telegram reading:

"24FRX 38 WUX CINCINNATI OHIO FEB 26 1943 NFT
BROTHER JOHN
MONT LA SALLE VINEYARDS FONE 6F3 NAPA CALIF
RETELEGRAM TAKE ALL WINE AT PRICES SPECIFIED
EXCEPT DRY RED AND DRY WHITE PREPARE SALES
CONTRACT AND SHIP SAMPLES AT ONCE WIRE TODAY
CONFIRMATION SALE SWEET WINE TO US SO WE MAY
COMMENCE ACCUMULATING FUNDS FOR CASH PAY-
MENTS
GIBSON, GIBSON WINE CO"

It denied, however, that it had ever made any offer either orally or in writing to plaintiffs to sell the wine referred to or any wine to plaintiffs and denied the allegations of plaintiffs' complaint to the contrary. Also it denied that plaintiffs waived or dispensed with the forwarding of samples, or that defendant had, through Hoffman or otherwise, requested Gibson to come to California to take delivery of any wine, and denied that Hoffman or defendant transmitted any written communication to plaintiffs except the telegram sent on February 25th, and denied that defendant signed any written offer to sell any wine to plaintiffs or signed any written contract or any written note or memorandum of any such contract. The other allegations of plaintiffs' complaint above set forth were denied, except that it was admitted that Gibson came to California in March, 1943.

As a further defense defendant pleaded sections 1624a, 1724 and 2309 of the Civil Code and section 1973a of the Code of Civil Procedure of California.

On April 12, 1943, defendant filed a notice of motion for summary judgment, on the ground that plaintiffs' action had no merit. Attached thereto were affidavits by Hoffman, and two attorneys, Leslie C. Rogers and John H. Painter.

The affidavit of Hoffman alleged that he was general manager of De La Salle Institute, that on February 25th he transmitted the telegram of February 25th to Gibson Wine Company, that said telegram was the only written communication sent or delivered by him to plaintiffs regarding any of

the matters referred to in plaintiffs' complaint, and that plaintiffs' reply telegram was the first reply, either verbal or in writing, received by defendant or affiant from plaintiffs in answer to the telegram of February 25th, and that no communications, either verbal or in writing, were had between affiant and plaintiffs between the time affiant sent his telegram and the time he received the reply telegram; that on March 5th affiant left California, returning on March 10th, on which latter date he was informed by telephone that a letter from Gibson addressed to him had arrived at the office of defendant in Napa; that he returned to Napa on March 13th, and saw said letter with which were enclosed duplicate copies of a proposed form of contract and a check for $25,000 payable to defendant, and signed by plaintiff Gibson. The contents of the proposed contract were then set forth, same reciting that defendant had offered to sell and plaintiff had agreed to buy 500,000 gallons of described wines at the prices set forth, that $25,000 was tendered as a binder and part payment for such purchase, and that the balance of payment should be made as soon after March 17th as the seller could give clear title, the transaction to be consummated on or before March 24th. Affiant further alleged that the day following receipt of said letter and check affiant delivered same to attorney Rogers and instructed him to return them to Gibson; that no written communications of any nature were sent to plaintiffs by affiant or by defendants except those set forth and that no written documents or papers were signed by them, and that ''no contract of any nature has, at any time, been entered into between defendant De La Salle Institute and plaintiffs or any of them.''

The affidavit of attorney Rogers merely alleged the receipt by him of the letter, contract and check referred to in the affidavit of Hoffman, and set forth the contents of a letter written by Rogers to Gibson dated March 16th, in which he said that he was returning the check and agreement, that the terms were not acceptable, and that in the meantime Brother John had made other arrangements, also stating:

''I discussed with Brother John the communications which he had had with you some time ago and advised him at that time that it seemed to me that it would be impossible to make any agreement with your company, the Gibson Wine Company, without your being here on the ground and I at that time advised him not to accept any down payment from you

or make any commitments because of the great distance between us and because market condition would not permit of a protracted negotiation.''

The affidavit of attorney Painter merely refers to a letter which was written by plaintiffs' attorney to Hoffman dated March 18, 1943, and his reply thereto in which reply he stated ''our investigation has disclosed that no contract of any nature has been consummated between our client and Gibson Wine Company. In this regard we refer you to our letter to Mr. R. H. Gibson dated March 16, 1943.''

In opposition to defendant's motion for summary judgment, Gibson filed an affidavit in which he stated that in January and in February, 1943, he went from Ohio to California for the purpose of buying wines for plaintiff Gibson Wine Company, and on or about February 6, 1943, called at defendant's vineyards where he met Hoffman; that he advised Hoffman that his company was desirous of buying wine from defendant, and Hoffman advised him that defendant contemplated the sale of a large quantity of wine, and that a decision on the question of selling would be made in New York about February 8th, and that in the event a determination to sell was then made, he would meet Gibson in Chicago to discuss a sale to him; that in accordance with said arrangement he met Hoffman in Chicago on February 19, 1943, pursuant to a telegram confirming appointment for that date; that ''at said meeting the sale of wine was agreed upon at approximate prices but said Stanley Hoffman stated that he would not fix the exact prices until he had returned to California, after which he would fix the exact price and quantity of each variety which he wanted to sell''; that on the morning of February 26th he received the telegram hereinbefore referred to dated February 25th, and that within two hours after receipt of same he accepted by telegram the purchase of 400,000 gallons of wine at the prices quoted therein, in the words of the above mentioned telegram of February 26th; that reference to a sales contract in the telegrams was made because of a discussion in Chicago with Hoffman wherein affiant suggested that a sales contract was wanted so that it could be exhibited to affiant's bankers and ''was to be and was meant to be substituted for the contract made by the interchange of wires for that purpose only, and was so understood by said Stanley Hoffman''; that ''request by affiant for confirmation by wire was not meant to be nor was it understood by Stanley Hoff-

man as a condition to a contract but was requested so that a tangible document could be exhibited to affiant's bankers in the interim and before the arrival of the contract which was to be drawn by Stanley Hoffman and mailed to affiant''; that ''the shipment of samples to affiant was requested in said telegram, not as a condition to the making of the contract, but for the purpose of determining whether or not specific blends to be made by defendant of the wines purchased were desirable. Said request for samples was ultimately waived between the parties on March 5, 1943, and was not intended as a condition of acceptance and was not understood by the defendant De La Salle Institute, acting through Stanley Hoffman, as a condition of acceptance of said offer contained in the night letter transmitted by the defendant on the night of February 25, 1943''; that ''the quality of wine to be sold and shipped to the Gibson Wine Company was well known to this affiant prior to the interchange of telegrams and was represented by said Stanley Hoffman prior to said interchange of telegrams as meeting the requirements and standards for the shipping of wine set by the State of California, and the Federal Government''; that ''within three hours from the time of sending said telegram by affiant on February 26, 1943 to defendant Stanley Hoffman telephoned from California to affiant in Cincinnati''; that in said telephone conversation said Stanley Hoffman ''considered'' that the sale of 400,000 gallons of wine at the prices quoted in his telegram had been completed by the interchange of telegrams, and stated that he desired to sell the additional 100,000 gallons of wine mentioned in his night letter to affiant, and asked if affiant could use an additional 100,000 gallons if it were one-half sweet and one-half dry wine; that ''affiant informed said Stanley Hoffman that he could and Stanley Hoffman stated that he would sell fifty thousand (50,000) gallons of sweet wine consisting of twenty-five thousand (25,000) gallons of Muscatel and the other twenty-five thousand (25,000) gallons of sweet wine either White Port or Angelica after he checked his inventory to see which of the latter was available. Twenty-five thousand (25,000) gallons of dry red wine and twenty-five thousand (25,000) gallons of dry white wine also were agreed upon for sale at the prices quoted in the telegram''; that ''in this conversation Brother John was reminded to prepare a sales contract for the purpose discussed in Chicago on February 19,

1943 and which affiant could show to his banking connections and other people from whom he was to secure financial aid and which would be substituted for the telegraphic agreement''; that Stanley Hoffman promised to prepare and forward the same; that when said contract did not arrive, on March 5, 1943, affiant telephoned Hoffman and was advised by him that because of pressure of business and the illness of his father he had been unable to prepare one; that in said conversation said Hoffman was advised that it was unnecessary to send the samples mentioned in the telegram because affiant could do the necessary blending himself; that Hoffman then requested that affiant come to California to take delivery of the wine and make payment in full; that upon insistence of Hoffman affiant agreed to come to California on March 16, 1943, and an appointment was arranged at the Mills plant at Sacramento on that day; that ''said Stanley Hoffman in said conversation of March 5, 1943 also requested an initial payment or deposit of. Twenty-five thousand ($25,000.00) Dollars and at his further suggestion that a receipt be prepared for the said Twenty-five thousand ($25,000.00) Dollars by affiant, which would answer the purpose of a detailed sales contract and which would include the one hundred thousand (100,000) gallons not purchased by interchange. of telegrams, a memorandum agreement and receipt prepared by affiant was sent to said Stanley Hoffman together with a check for Twenty-five thousand ($25,000.00) Dollars, which said receipt and agreement said Stanley Hoffman knew was to be substituted for the agreement to purchase four hundred thousand (400,-000) gallons of wine made in the interchange of telegrams between the parties herein only, when, as and if accepted by defendants''; that Hoffman did not keep the appointment for March 16th, though affiant came to California from Cincinnati for the sole purpose of taking possession of and paying for said wine at time of delivery, and that on March 17th affiant was advised by Hoffman that he had changed his mind and would not make delivery of the wine, whereupon affiant demanded delivery and offered to pay the entire purchase price.

After the filing of Gibson's affidavit defendant made a motion to strike therefrom substantially all of the allegations thereof except the allegations that Hoffman and Gibson met in Chicago, the allegations as to the sending and receiving of the two telegrams, the allegation that Hoffman telephoned to

Gibson from California to Cincinnati on February 26, that affiant telephoned Hoffman on March 5th, and that a memorandum agreement was sent to Hoffman with $25,000 check. A hearing was had by the trial court upon defendant's motion for summary judgment and its motion to strike, at the conclusion of which both motions were granted, plaintiffs' complaint was dismissed, and judgment entered in favor of defendants. The order granting the motion recited that "defendant having filed affidavits in support of said motion containing facts showing that said action of plaintiffs has no merit and containing facts sufficient to entitle said defendant to a judgment in said action; and plaintiffs having filed in opposition to said motion an affidavit by Robert H. Gibson, one of the plaintiffs herein, and said defendant having moved this Court to strike certain portions of said Affidavit of Robert H. Gibson; and said Motion to Strike having been duly heard and granted as to all of the specifications therein contained; and plaintiffs having failed to set forth in any affidavit filed herein facts showing that a or any good cause of action upon the merits exists in favor of plaintiffs or any of them against said defendant; and the Court having concluded that there was no showing in any affidavit filed by plaintiffs or by any of them of facts sufficient to present a or any triable issue of fact," the complaint of plaintiffs should be dismissed, etc.

From the judgment which followed plaintiffs have appealed, contending that the trial court abused its discretion in granting the summary judgment, in that the matters set forth in plaintiffs' counteraffidavit clearly show "such facts" as are sufficient to present "a triable issue of fact" within the provisions of section 437c of the Code of Civil Procedure; that the trial court erred in granting defendant's motion to strike and in its consequent refusal to consider the circumstances surrounding the interchange of telegrams; and that the contract sued upon is enforceable under the statute of frauds—in short, that the trial court attempted to determine the triable issue, to wit, the fact of whether or not a contract was made rather than to determine whether a triable issue was presented.

█ The summary judgment statute is drastic and its purpose is not to provide a substitute for existing methods in the trial of issues of fact. It should be used with caution. (*Walsh v. Walsh*, 18 Cal.2d 439, 444 [116 P.2d 62]; *Eagle Oil & Ref. Co. v. Prentice*, 19 Cal.2d 553, 556 [122 P.2d 264].)

In *Walsh* v. *Walsh, supra,* the court said that in passing upon a motion for summary judgment the primary duty of the trial court is to decide whether there is an issue of fact to be tried; and if it finds one, it is then powerless to proceed further, but must allow such issue to be tried by a jury unless a jury trial is waived; that *issue finding* rather than *issue determination* is the pivot upon which the summary judgment law turns; that the universal practice is to permit this expedited procedure *only where it is perfectly plain that there is no substantial issue to be tried.* And in *Eagle Oil & Ref. Co.* v. *Prentice, supra,* it is said, at page 555, that the issue to be determined by the trial court in consideration of a motion for summary judgment is whether or not a triable issue of fact has arisen, and *not* to pass upon or determine the issue itself. The foregoing cases also hold that in considering the affidavits on motion for such judgment those of the moving party are to be strictly construed and those of the party opposing the motion are to be liberally construed to the end that he will not be summarily deprived of the full hearing available at a trial of the action and the rights incident thereto, such as the right of cross-examination; and that the facts alleged in the affidavits of the party against whom the motion is made must be accepted as true, and that such affidavits, to be sufficient, need not necessarily be composed wholly of strictly evidentiary facts.

It is conceded by respondent in its brief that a motion for a summary judgment may not be granted except on affidavits in favor of the moving party containing facts sufficient to entitle him to judgment in his favor. And it is apparent from the affidavits filed by respondent, who was the moving party in this case, that it contends that a contract of sale entitling plaintiff to a judgment could be established only by writings, that the only writings are the telegrams exchanged between the parties, that such telegrams are insufficient to make out a contract, that the matters set forth in Gibson's affidavit pertaining to the acts of the parties prior to the exchange of the telegrams, and subsequent thereto, including two telephonic conversations between Hoffman and Gibson after the former's receipt of Gibson's telegram of February 26th, were incompetent and immaterial and could not be shown at a trial of the action. In short, that only a question of law is involved, which must be resolved in respondent's favor. Upon the hearing before the trial court this was the ground urged, and it

is the ground relied upon in respondent's brief, it being argued therein (1) that Hoffman's telegram was not an offer; (2) that if it was an offer it was not accepted by appellants because the reply telegram rejected the terms "cash," and for that reason the telegram of February 25th lost its efficacy as a memorandum; and (3) that if the telegram of February 25th was an offer it is insufficient as a memorandum to satisfy the statute of frauds in that it does not specify the quality of the wine.

Appellants, on the other hand, contend that the telegram of February 25th constituted an offer on the part of defendants which was accepted by plaintiffs; that the transaction being one for the sale of goods under section 1723 and 1724 of the Civil Code, the note or memorandum required to render it enforceable need not contain all of the details of the agreement between the parties, but is sufficient if it contains the essential elements; that the telegrams in this case do contain all such essential elements and that, at any event, parol evidence is admissible to show the circumstances both before and after their exchange, for the purpose of clarifying the meaning of the language used therein.

It is obvious that unless it can be said as matter of law that the telegrams alone are to be looked to for a determination of the question whether or not there was a contract, that there are issues of fact in the case which necessitate that it be tried regularly, and that it was error to grant defendant's motion for summary judgment.

It is well established that where the meaning of language used in a note or memorandum under the statute of frauds is uncertain or ambiguous, parol evidence is admissible to show the circumstances surrounding the transaction for the purpose of arriving at a determination of the meaning intended and understood by the parties. A leading case, not only in this state but elsewhere, is *Brewer* v. *Horst & Lachmund Co.*, 127 Cal. 643 [60 P. 418, 50 L.R.A. 240]. There defendant's agent sent to defendant a telegram reading: "Bought thirteen at eleven five-eighths net you; confirm purchase by wire tŏ Brewer, nineteen sixteen M street, inspection on or before Saturday. Do you want fifteen at eleven quarter?" Defendant then wired plaintiff Brewer: "We confirm purchase Wagner eleven five-eighth cents, like sample." The only question presented was whether these telegrams consti-

tuted a sufficient note or memorandum of the contract to satisfy the statute of frauds. The court said, pp. 646-647:

"If there were nothing to look to but the telegrams, the court might find it difficult, if not impossible, to determine the nature of the contract, or that any contract was entered into between the parties. But the court is permitted to interpret the memorandum (consisting of the two telegrams) by the light of all the circumstances under which it was made; and if, *when the court is put into possession of all the knowledge which the parties to the transaction had at the time, it can be plainly seen from the memorandum who the parties to the contract were, what the subject of the contract was, and what were its terms, then the court should not hesitate to hold the memorandum sufficient.* Oral evidence may be received to show in what sense figures or abbreviations were used; and their meaning may be explained as it was understood between the parties. (*Mann* v. *Higgins,* 83 Cal. 66 [23 P. 206]; *Berry* v. *Kowalsky,* 95 Cal. 134 [30 P. 202, 29 Am.St.Rep. 101]; *Callahan* v. *Stanley,* 57 Cal. 476.) Also: 'Parol evidence is always admissible to explain the surrounding circumstances, and situation and relations of the parties, at and immediately before the execution of the contract, in order to connect the description with the only thing intended, and thereby to identify the subject matter, and to explain all terms and phrases used in a local or special sense.' (*Preble* v. *Abrahams,* 88 Cal. 245 [26 P. 99, 22 Am.St.Rep. 301]; *Towle* v. *Carmelo etc. Co.,* 99 Cal. 397 [33 P. 1126].) Interpreting the telegrams by the foregoing rules, it is not difficult to see that the parties to the contract are George Brewer, of 1916 M street, Sacramento, California, vendor, and Horst and Lachmund Company, of Santa Rosa, California, vendee; that the contract was one of purchase and sale, and the subject of it was the property represented in the first telegram by 'thirteen' and well known by the parties to consist of two hundred and ninety-six bales of hops, and to be the last pickings of hops grown by plaintiff upon his farm in Sacramento county during the year 1897, and that the price to be paid for said hops was eleven and five-eighths cents per pound." (Italics ours.)

In *Walsh* v. *Walsh, supra,* the court said that the words "child or children," as used in an agreement which was the subject of the controversy, were ambiguous and uncertain; that on its face the phraseology of the paragraph in which

they were used was reasonably consistent with either of the interpretations advanced by the litigants, adding, pp. 443-444:

"When a contract is in any of its terms or provisions ambiguous or uncertain, 'it is primarily the duty of the trial court to construe it *after a full opportunity afforded all the parties in the case to produce evidence of the facts, circumstances and conditions surrounding its execution and the conduct of the parties relative thereto.*' (*Barlow* v. *Frink*, 171 Cal. 165, 172 [152 P. 290].) (Italics added.) The governing principle as to when parol testimony may be introduced to explain the language of a contract or to ascertain the intention of the parties is clearly set forth in *Kenney* v. *Los Feliz Investment Co., Ltd.*, 121 Cal.App. 378, 386, 387 [9 P.2d 225], as follows: 'It is a settled rule that when the language employed is fairly susceptible of either one of two constructions contended for without doing violence to its usual and ordinary import an ambiguity arises where extrinsic evidence may be resorted to for the purpose of explaining the intention of the parties, and that for this purpose conversations between and declarations of the parties during the negotiations at and before the execution of the contract may be shown (*Balfour* v. *Fresno C. & I. Co.*, 109 Cal. 221 [41 P. 876]).' And in *Scott* v. *Sun-maid Raisin Growers Assn.*, 13 Cal.App.2d 353 [57 P.2d 148], the court stated at p. 359: 'When the meaning of the language of a contract is uncertain or doubtful and parol evidence is introduced in aid of its interpretation, *the question of its meaning is one of fact.* . . . (*Thomson* v. *Leak*, 135 Cal.App. 544, 548 [27 P.2d 795]; *Gallatin* v. *Markowitz*, 139 Cal.App. 10, 13 [33 P.2d 424]; *Coats* v. *General Motors Corp.*, 3 Cal. App.2d 340, 356 [39 P.2d 838].)' (Italics added.)"

In *Tennant* v. *Wilde*, 98 Cal.App. 437, the court said at pages 444 and 445 [277 P. 137]:

"It is our duty to so interpret this contract 'as to give effect to the mutual intention of the parties as it existed at the time of contracting, *so far as the same is ascertainable*' (Civ. Code, § 1636). (Italics ours.) 'The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.' (Civ. Code, § 1641.) We must also give it 'such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties' (Civ. Code, § 1643). After all,

the essential theory in construing any contract is to find out what the parties meant, and this must be done by an examination of the language used therein, provided the same is 'clear and explicit' (Civ. Code, § 1638). Where the language, as in the instrument under discussion, is neither clear nor explicit, resort may be had to 'the circumstances under which it was made and the matter to which it relates.' (Civ. Code, § 1647; Code Civ. Proc., §§ 1856, 1860.) For this purpose it is proper to consider the relations between the parties, the work to be done and the correspondence leading up to the execution of the agreement (*Williams* v. *Ashurst Oil* [etc.] *Co.* 144 Cal. 619 [78 P. 28]; *Payne* v. *Neuval,* 155 Cal. 46 [99 P. 476]). . . .

"For the purpose of determining what the parties intended by the language used, it is competent to show not only the circumstances under which the contract was made, but also to prove that the parties intended and understood the language in the sense contended for; and for that purpose the conversation between, and declarations of, the parties during the negotiations at and before the time of the execution of the contract may be shown." (With citations.)

The court then quoted from *Balfour* v. *Fresno Canal & Irrigation Co.,* 109 Cal. 221, where it is said, at pages 225-226 [41 P. 876]:

"If, however, the language employed be fairly susceptible of either one of the two interpretations contended for, without doing violence to its usual and ordinary import, or some established rule of construction, then an ambiguity arises, which extrinsic evidence may be resorted to for the purpose of explaining. This is not allowing parol evidence for the purpose of varying or altering the contract, or of putting a different sense and construction upon its language from that which it would naturally bear, but for the purpose of showing the circumstances under which the language was used, and applying it according to the intention of the parties. 'The true interpretation of every instrument being manifestly that which will make the instrument speak the intention of the party at the time it was made, it has always been considered an exception, or perhaps a corollary, to the general rule above stated, that when any doubt arises upon the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated

and ascertained by evidence *dehors* the instrument itself.'
(*Sandford* v. *Newark etc. R. R. Co.*, 37 N.J.L. 1, 3.) For the
purpose of determining what the parties intended by the
language used, it is competent to show not only the circum-
stances under which the contract was made, but also to prove
that the parties intended and understood the language in
the sense contended for; and for that purpose the conversa-
tion between and declarations of the parties during the
negotiations at and before the time of the execution of the
contract may be shown.''

In *Reed* v. *Merchants' Mutual Ins. Co.*, 95 U.S. 23, 30 [24
L. Ed. 348, 349], the determination of the case depended upon
the interpretation to be put upon a phrase in a marine in-
surance policy, ''the risk to be suspended while vessel is at
Baker's Island loading,'' the loss of the vessel at Baker's
Island making it necessary to determine whether the phrase
meant while the vessel was in port for the purpose of loading
or while it was there actually loading. The court said:

''A strictly literal construction would favor the latter
meaning. But a rigid adherence to the letter often leads to
erroneous results, and misinterprets the meaning of the parties.
That such was not the sense in which the parties in this case
used the words in question is manifest, we think, from all the
circumstances of the case. Although a written agreement
cannot be varied (by addition or subtraction) by proof of
the circumstances out of which it grew and which surrounded
its adoption, yet such circumstances are constantly resorted
to for the purpose of ascertaining the subject-matter and the
standpoint of the parties in relation thereto. Without some
knowledge derived from such evidence, it would be impossible
to comprehend the meaning of an instrument, or the effect to
be given to the words of which it is composed. This prelimi-
nary knowledge is as indispensable as that of the language
in which the instrument is written. A reference to the actual
condition of things at the time, as they appeared to the parties
themselves, is often necessary to prevent the court, in con-
struing their language, from falling into mistakes and even
absurdities.''

It is said in 6 California Jurisprudence 304-305, that it is
well established that for the purpose of arriving at a conclu-
sion as to the meaning of the terms used in a written contract,
when such meaning is in doubt, the acts of the parties done un-

der it and the practical construction given to it by them, afford the most reliable means of arriving at the intention and what was intended by its provisions. (Also see Code Civ. Proc., § 1860; Civ. Code, §1647; *Searles* v. *Gonzalez*, 191 Cal. 426, 431 [216 P. 1003, 28 A.L.R. 78] ; *Keithly* v. *Craig*, 79 Ind.App. 403 [135 N.E. 156] ; *Bird & Son, Inc.* v. *Guarantee Const. Co.*, 295 F. 451; *Mesibov, Glinert & Levy* v. *Cohen Bros., Mfg. Co.*, 245 N.Y. 305 [157 N.E. 148].)

In the light of the foregoing authorities let us consider the contentions of respondent set forth in its brief. The first one is that the telegram of February 25th did not constitute an offer to sell, but was merely a quotation of prices. Reliance is placed upon the absence from the same of the word "offer" or any statement that respondent would sell, or any request or invitation for an acceptance; and it is urged that the words "Find it necessary to ask for following prices . . ." are inconsistent with an offer, citing *Courteen Seed Co.* v. *Abraham*, 129 Ore. 427 [275 P. 684] ; *Nebraska Seed Co.* v. *Harsh*, 98 Neb. 89 [152 N.W. 310, L.R.A.1915F 824] ; *Cherokee Tanning Extract Co.* v. *Western Union Telegraph Co.*, 143 N.C. 376 [55 S.E. 777, 118 Am.St. Rep. 806], and *Brillhart* v. *Beever* (Tex.Civ.App.), 198 S.W. 973, which it contends support its contention. The trial court accepted this contention of respondent upon the authority of the cases cited. We think, however, they are clearly distinguishable upon the facts, particularly since the message before us contains the additional words, "Please wire today if interested and samples and *sales contract* will go forward." (Italics ours.) This case is comparable to *Buckberg* v. *Washburn-Crosby Co.*, 115 Mo.App. 701 [92 S.W. 733], where plaintiff wrote defendant concerning the price of flour, and defendant replied quoting certain flour at a given price further stating that such quotation was for "immediate wire acceptance," whereupon plaintiff immediately wired defendant to send 50 barrels at their quotation. The court held that there was a completed contract, saying that defendant's wire did more than quote the price of flour and in effect said that defendant would fill plaintiff's order at the price quoted if he would wire his order immediately.

Also see *Fairmount Glass Works* v. *Grunden Martin Woodenware Co.*, 106 Ky. 659 [51 S.W. 196], where plaintiff wrote defendant, "Please advise us the lowest price you can make

us on our order for ten carloads of Mason green jars . . . state terms and cash discount." Defendant replied "We quote you Mason fruit jars, complete, [stating prices] for immediate acceptance, and shipment not later than May 15, 1895; sixty days acceptance, or 2 off, cash in ten days." It was held that this constituted a present offer by defendant, the immediate acceptance of which closed the contract.

In *Lawrence* v. *Milwaukee etc. R. Co.*, 84 Wis. 427 [54 N.W. 797], a letter to plaintiff by defendant stated: "Referring to your call at our office last Saturday, relative to rate on about three million feet of logs from Kemster to Oshkosh, we are willing to name you rate on logs from point above mentioned to Oshkosh when loaded in Lake Shore cars, 5 cents per 100 pounds, minimum weight 28000 pounds. . . . This is the rate you asked for, and rate which you said would be satisfactory to you. If you will make the shipments, please advise us promptly, that we may prepare to move them. . . ." Plaintiff then wrote a letter saying: "In reply to your letter quoting rates I will say that I accept the rate you give on P. L. Co. cars. I will be down the first of the week, and make out a contract." The court held that defendant's letter was an offer, that plaintiff's reply was an acceptance; and it considered the subsequent conduct of the parties shown by parol evidence as indicating that both parties supposed that a contract existed.

But assuming that the language used in this case is subject to the construction put upon it by respondent, we think that it is equally subject to be construed as an offer to sell. The words "Find it necessary to ask," etc., are not such as are customarily used in a mere quotation of prices; and the further statement that *sales* contract would go forward fortifies this view. Respondent contends that the words used mean one thing, and appellants contend that they mean another, and as the language used is not so clear, certain and unambiguous as to preclude the introduction of parol evidence to explain its meaning and the intention of the parties, in the light of the authorities hereinbefore cited the meaning of the words used became a question of fact which the trial court was precluded from determining on motion for summary judgment but was compelled to determine only "after a full opportunity afforded all of the parties in the case to produce evidence of the facts, circumstances and conditions . . . and

the conduct of the parties relative thereto." (*Walsh* v. *Walsh, supra.*)

■ As to respondent's second contention that if Hoffman's telegram was an offer it was not accepted by plaintiffs because their reply message provided "Wire today confirmation sale sweet wine to us so we may commence accumulating funds for cash payments," respondent says in its brief, pages 20-21: "The offer tendered by Brother John proposed only a cash transaction; the mention of warehouse receipts merely gave appellants a means of minimizing their necessary outlay of cash. In replying to this proposal, appellants stated that they were desirous of accumulating funds for 'cash payments'. Unless the admitted use of the plural form is to be denied any significance whatever, it can mean only that appellants undertook to buy the wine on terms other than for cash and thereby rejected respondent's offer."

We find nothing in this phrase in the nature of a rejection of respondent's requirement that terms were to be cash. On the contrary, the expressed intention of plaintiffs to commence accumulating funds for "cash payments" indicates an acceptance of such terms; and the use of the plural "payments" instead of the singular "payment" can only by a most strained construction be said to indicate that plaintiffs contemplated a credit transaction and did not intend to pay cash on delivery. (Civ. Code, § 1762.) Furthermore, Hoffman's wire qualified the terms "cash" by stating that he could supply warehouse receipts on 250,000 gallons, which indicates, if it means anything, that he did not contemplate a single delivery. From the foregoing quotation from respondent's brief it is apparent that it is placing its own construction upon the language used, which indicates that said language is uncertain; and such being the case its meaning presents an issue of fact for trial in the light of the surrounding circumstances and the acts of the parties.

■ The next contention of respondent is that Hoffman's telegram is insufficient as a note or memorandum under the statute of frauds because it does not mention the quality of the wines. But no controversy about their quality has been raised in the action. It is only "when quality becomes a determining factor in identifying the subject matter" that quality has any place or importance in a memorandum of sale. (27 C.J.S. 675-676.) Gibson's affidavit alleges that he

knew the quality of the wine offered, and respondent, in its answer to plaintiffs' complaint, admits "that it has in its possession wine of the types and in the amounts set forth in said telegram of Feb. 25, 1943''; also it alleges that "said wines, and each of them, were, and now are, wines of good quality.'' This is not a case where it is contended by one party that a particular quality of wine was contracted to be sold and such contention is denied by the other party; and, so far as it now appears, no such controversy will arise.

It is well established that a note or memorandum under the statute of frauds need not contain all of the details of an agreement between the parties. In *Washington Dehydrated Food Co.* v. *Triton,* 151 Wash. 613 [276 P. 562], it was contended that a memorandum or note of an agreement to sell "2 cars apples" at a given price per pound was too indefinite and incomplete to create a contract, that it did not appear whether green apples or dried apples was meant. Parol testimony was admitted to show that agents of the parties had conferred prior to the execution of the writing, and that the one had dried apples to sell, and the other desired to purchase dried apples.

In *Zimmerman Bros. & Co.* v. *First National Bank,* 219 Wis. 427 [263 N.W. 361], the subject of a memorandum was 1,600 safety deposit boxes. One of the defenses set up in a suit for damages for failure to accept delivery was that the property was not sufficiently described in any writing to satisfy the statute of frauds. The court said that no more was required than reasonable certainty; that the description need not be so minute and exact as to exclude the possibility that some other goods than those intended would also fall within the words of the writing.

In *Haumersen* v. *Sladky,* 220 Wis. 91 [264 N.W. 653], a memorandum under the statute of frauds described the property as including "all personal property and crops, excepting therefrom one fat hog to be left on the premises until time to butcher, and also between 12 and 18 hens.'' The court found that the property which was to be included in the sale had been pointed out and was later listed in an inventory, and said that the identification of the subject matter could be shown by parol evidence as to the surrounding circumstances and situation of the parties at the time the contract was made. It cited *Inglis* v. *Fohey,* 136 Wis. 28 [116 N.W. 857, 859], to

the effect that if by aid of evidence showing the situation and surroundings of the parties at the time, and their subsequent acts, if any, construing the terms of the writing, the court can with reasonable certainty determine the meaning intended by the parties, the court will not allow the contract to fail, but will construe it in the light of such evidence, etc.

Also see *Northeastern Paper Co., Inc.* v. *Concord Paper Co.*, 242 N.Y. 562 [152 N.E. 428], where "all the paper in rolls now stored at the warehouse at 405 East Tenth St., New York City . . . as is." was held a sufficient memorandum.

In *Davis* v. *Arnold*, 267 Mass. 103 [165 N.E. 885], it was contended that a memorandum of sale of shares of stock was insufficient under the statute of frauds because it did not show that the shares were "participating" shares. There was evidence of conversations between the parties in which participating shares only were discussed. The court said that "the circumstances in the minds of the parties showed that the subject matter of the agreement was the participating shares"; and that "read in the light of the evidence the memorandum was a sufficient compliance with the statute."

In *Weil Clothing Co.* v. *National Garment Co.*, (Mo.App.) 148 S.W.2d 586, the court said that in determining the sufficiency of a writing to evidence a contract within the statute of frauds, there are three essential ingredients: the parties; the subject matter; and the price or consideration. It further said, page 594, quoting from an earlier Missouri case: "It is familiar law that the memorandum required to be in writing need not be an explicit, definite, and complete contract. The word 'memorandum' implies that much. It is always permissible to show the surroundings and circumstances of the contract, and it is sufficient, as against the statute of frauds, that, after the court is put in the same position as the parties themselves, the terms and subject-matter of the contract are made certain." (With citations.) There the contract read "Job All Boys Polo Shirts," and was held sufficient as a memorandum of the goods purchased.

In *Darnell* v. *Lafferty*, 113 Mo.App. 282 [88 S.W. 784], the subject matter of a contract was "ten cows and heifers." Defendant refused to receive or pay for the cattle, and contended that the memorandum was insufficient under the statute of frauds. The court held it sufficient, stating that there was enough in the memorandum to authorize the reception

of parol evidence showing the facts and circumstances sur-
rounding the transaction, thus enduing the court with the
knowledge and facts in the minds of the contracting parties
so that it could intelligently apply the words of the memoran-
dum to the subject matter, to wit, the particular ten cows and
heifers in the minds of the contracting parties at the time,
thus positively identifying the subject of the contract.

In *Preble* v. *Abrahams*, 88 Cal. 245 [26 P. 99, 22 Am.St.
Rep. 301], it was contended that an agreement by plaintiff to
sell to defendant ''40 acres of the eighty-acre tract at Biggs''
was not sufficiently certain; that the description of the prop-
erty in the writing was so uncertain as to render the instru-
ment void. But the court said, page 250:

''Parol evidence is always admissible to explain the sur-
rounding circumstances, and situation and relations of the
parties, at and immediately before the execution of the con-
tract, in order to connect the description with the only thing
intended, and thereby to identify the subject-matter, and to
explain all technical terms and phrases used in a local or spe-
cial sense. (Pomeroy on Contracts, sec. 152.)''

The court then went on to discuss the evidence which tended
to show the location of the 80-acre tract and in what part of it
the 40 acres which plaintiff agreed to sell to defendant was
situated, which included evidence that at the same time plain-
tiff agreed to sell the other 40 acres of said 80-acre tract to
another purchaser. (Also see *Jungkuntz* v. *Carter*, (Mo.
App.) 254 S.W. 359; Greenleaf on ''Evidence,'' § 288.)

We therefore conclude that respondent's contention
that the telegram of February 25th is insufficient as a note or
memorandum under the statute of frauds because it does not
mention the quality of the wines, has no merit, and that if,
as and when any controversy arises between the parties as to
quality, parol evidence will be admissible to establish the un-
derstanding of the parties on that subject.

Another matter should, perhaps, be considered by this
court, though it is not relied upon in respondent's brief before
us. The opinion of the trial court, which is included in the
record on appeal, indicates that it based its decision in part
at least on the proposition that the telegrams indicate that the
parties contemplated a sale by sample and upon a subsequent
sale contract, as it said that ''any fair construction of the
telegram [of February 25th] would require that these ele-

ments be given full consideration," and that the suggestion in both telegrams that samples be furnished and a sales contract made "leaves no doubt that both parties at the time of sending the telegrams must have considered them as being essentials to a sale."

Plaintiffs assert that the purpose of sending samples was to furnish them advance information as to blending of the various wines purchased, and that the sole purpose of a further contract was to facilitate the procuring of adequate financing by plaintiffs, and that neither the sending of samples nor the execution of a further contract was made, or intended to be made, prerequisite to the consummation of the sale of the 400,000 gallons of sweet wines referred to in their telegram.

It is said in 17 Corpus Juris Secundum 391, that whether an informal agreement which, according to the understanding of the parties, is to be reduced to writing, takes effect as a complete contract at once, or only when a formal written contract is executed, depends upon the intention of the parties as construed from the facts of a particular case. In *Thompson* v. *Schurman,* 65 Cal.App.2d 432, 440 [150 P.2d 509], this court held that where the parties agree upon the terms and conditions of a contract with the mutual intention that it shall thereupon become binding, the mere fact that a formal written agreement to the same effect is thereafter to be prepared and signed does not alter the binding validity of the original contract; and that whether an oral agreement should take effect forthwith as a completed contract depends upon the intention of the parties, and that such intention is to be determined by the surrounding facts and circumstances of each particular case. (Also see *Billings* v. *Wilby,* 175 N.C. 571 [96 S.E. 50, 51], and cases there cited.)

The trial court in this case, then, was obligated to determine the intention of the parties regarding a subsequent written contract, and to determine it, not from the language of the telegrams alone but in light of the circumstances surrounding the case. What was the intention of the parties became a question of fact which was not properly determinable in this proceeding. The same is true as to the purpose of sending samples, and whether or not the sending and receipt of same were intended to be a condition precedent to the consummation of a sale. Also it is to be noted that plaintiff's affidavit alleges that the sending of samples was waived.

▓▓ The trial court also said in its opinion that the contract, as contended by plaintiffs to exist, was deficient in that it did not provide for such details as storage, place of delivery, transportation to shipping point, containers, cooperage, insurance, care of the wine and like matters; that in the absence of these specifications in the telegrams equity could not enforce specific performance.

But section 1723 of the Civil Code, which is a part of the Uniform Sales Act, provides that a contract to sell, or a sale, may be made in writing or by word of mouth, or partly in writing and partly by word of mouth, or may be inferred from the conduct of the parties. And section 1724 of the Civil Code, which is the same as section 1624a of that code, does not require that all of the details of a contract of sale be set forth in the writing. ▓▓ The note or memorandum of a contract of sale is merely evidentiary. In *Clarke* v. *Fiedler,* 44 Cal. App.2d 838, 846 [113 P.2d 275], the court said that "the formal written contract is not the agreement of the parties, but only evidence of that agreement." Also see *Duncan* v. *Wohl, South & Co.,* 201 App.Div. 737 [195 N.Y.S. 381.] It is said in 12 California Jurisprudence 899-900:

"Under the statute of frauds requiring that the contract 'or some note or memorandum thereof,' be in writing, the writing essential need not be a formal contract, drawn up with technical exactness, or even one intended by the parties to create an obligation. Indeed, it may be inadequate as a formal contract, and may not, for instance, contain a formal and direct expression of the covenant of one of the parties. A 'note or memorandum' of the contract is all that is required."

(Also see *Bresky* v. *Rosenberg,* 256 Mass. 66 [152 N.E. 347, 351]; *Green & Bennett* v. *McCormack,* 83 N.H. 509 [144 A. 853]; *Spiegel* v. *Lowenstein,* 162 App.Div. 443 [147 N.Y.S. 655].)

It is also said in *Buckner* v. *A. Leon & Co.,* 204 Cal. 225, 227 [267 P. 693], that it has long been the rule that when parties have not incorporated into an instrument all of the terms of their contract, evidence is admissible to prove the existence of a separate oral agreement as to any matter on which the document is silent and which is not inconsistent with its terms; and that when there is a known usage of trade, persons carrying on that trade are deemed to have contracted in reference

to the usage unless the contrary appears. Also see *Sivers* v. *Sivers,* 97 Cal. 518, 521 [32 P. 571]; *Greathouse* v. *Daleno,* 57 Cal.App. 187 [206 P. 1019]; *Crawford* v. *France,* 219 Cal. 439, 443 [27 P.2d 645]; *Stockburger* v. *Dolan,* 14 Cal.2d 313, 317 [94 P.2d 33, 128 A.L.R. 83].

In the instant case details such as storage, place of delivery, transportation and the like, mentioned by the trial court, are matters either governed by the usages of the business, or subject to proof by parol evidence. Absence from the memorandum of provision therefor is not fatal to plaintiffs' case.

Our conclusion is that in this proceeding plaintiffs' affidavit in opposition to the motion for summary judgment establishes the existence of issues of fact which must be determined at a trial, and that the trial court erred in granting defendant's motion to strike and its motion for summary judgment. Even when there is doubt as to whether the latter motion should be granted it should be denied (*Davis* v. *Investment Land Co.,* 296 Pa. 449 [146 A. 119], and cases there cited). Also it is said in *Gravenhorst* v. *Zimmerman,* 236 N.Y. 22 [139 N.E. 766, 27 A.L.R. 1465] (quoted in *McComsey* v. *Leaf,* 36 Cal.App.2d 132 [97 P.2d 242]):

*"It never could have been, or in justice ought to have been the intention of those who framed our Practice Act and rules thereunder that the decision of such a serious question as this should be flung off on a motion for summary judgment.* (Italics ours.) Whatever the final judgment may be, the defendants were entitled to have the issue deliberately tried, and their right to be heard in the usual manner of a trial protected."

The same appropriately may be said of plaintiffs' rights in this case.

The judgment is reversed.

Peek, J., concurred.

THOMPSON, J.—I dissent. I am of the opinion defendants' motion for summary judgment, under section 437c of the Code of Civil Procedure, was properly granted, for the reason that it appears there is no merit in plaintiffs' cause of action for specific performance of their alleged executory contract to purchase wine. In holding that plaintiffs' averments in their affidavits opposing the motion present a valid

cause of action, the majority opinion, in my judgment, violates the provisions of section 1698 of the Civil Code, which provides that:

"A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

The suit is founded upon two telegrams which the majority opinion, construing them in the light of the averments of plaintiffs' affidavits, holds constitute a completed written contract to purchase wine from the defendants. The purported contract was not executed. The defendants denied that a contract was agreed upon. They pleaded the statute of frauds. The validity of the asserted contract must stand or fall upon a lawful interpretation of the two telegrams construed in the light of competent averments of the affidavits presented on the motion. In stating purported facts in plaintiffs' affidavits in opposition to the motion, for the purpose of construing the language of the telegrams, they have averred alleged extrinsic oral agreements between the parties which constitute alterations or modifications of the essential provisions of those instruments, rather than mere interpretations of ambiguous or uncertain terms or language. Their averments amount to a substitution of alleged oral agreements for the written instruments upon which plaintiffs rely as a completed contract. Section 1638 of the Civil Code provides that:

"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."

In the guise of explaining the presence of certain terms, for instance the proposal to furnish samples of wine and a formal written contract, the averments of subsequent oral agreements result in eliminating those material provisions entirely as unnecessary terms of the alleged contract. The affiants assert that, by oral agreements, the samples were not required except for plaintiffs' own benefit in blending wines for resale, and that the written contract was provided for merely to enable plaintiffs to exhibit it to their banker to procure funds with which to finance the purchase of wine. In other words, the alleged oral agreements result in expunging from the written messages essential terms which are clear and unam-

biguous. This, of course, may not be lawfully done. That procedure would destroy the integrity of written contracts.

I am convinced the telegrams do not constitute a completed contract. I am also satisfied that the portions of plaintiffs' affidavits which were stricken from the record would be incompetent evidence at a trial on the merits because they tend to vary the terms of a written instrument. It was therefore harmless to strike them out. Plaintiffs' cause of action is therefore without substantial merit.

The defendants' telegram said:

"FIND IT NECESSARY TO ASK FOR FOLLOWING PRICES [specifying various quantities of designated wine with prices per gallon mentioned, including 100,000 gallons of dry red and dry white wine], OR AN AVERAGE PRICE OF .80 PER GALLON ON THE ABOVE 500,000 GALLONS TERMS CASH ... PLEASE WIRE TODAY IF INTERESTED AND SAMPLES AND SALE CONTRACT WILL GO FORWARD."

The plaintiffs replied by wire the following day, as follows:

"RETELEGRAM TAKE ALL WINE AT PRICES SPECIFIED EXCEPT DRY RED AND DRY WHITE PREPARE SALES CONTRACT AND SHIP SAMPLES AT ONCE WIRE TODAY CONFIRMATION SALE SWEET WINE TO US SO WE MAY COMMENCE ACCUMULATING FUNDS FOR CASH PAYMENTS."

The negotiations proceeded no further. The defendants did not wire confirmation of plaintiffs' offer to buy 400,000 gallons of wine. The proposed written agreement was not prepared by defendants nor executed nor forwarded. No samples were forwarded. When the plaintiffs subsequently prepared a written agreement on their own terms and forwarded it together with their check for $25,000, as part payment, the contract was not signed by the defendants, but was promptly returned with the accompanying check to the plaintiffs. The defendants assumed their offer to sell wine had not been accepted upon the terms proposed, and that the agreement to sell was not completed. Defendants therefore refused to continue negotiations with the plaintiffs. This suit was then commenced.

Upon the motion for summary judgment, plaintiffs' affidavits in opposition thereto averred that the parties orally discussed the terms of the agreement and it was understood by them that: (1) The formal written contract mentioned in the telegrams was to be "substituted for the contract made

by the interchange of wires" for the sole purpose of exhibiting that document to plaintiffs' bankers to enable them to procure the necessary loan of money with which to pay for the wine; (2) Plaintiffs' request contained in their reply telegram to "wire today if interested" was also for the mere purpose of exhibiting the message to the banker as proof of the existence of the contract to aid plaintiffs in financing the purchase of the wine; (3) The request in said telegram to "ship samples" was not a condition precedent to acceptance of the wine, but was merely to determine "whether or not any specific blends . . . were desirable; and, (4) Subsequent to the exchange of telegrams, Brother John orally accepted by means of a telephone, plaintiffs' offer to buy 400,000 gallons of wine in lieu of the defendants' offer to sell them 500,000 gallons.

The foregoing averments refute the clear and unambiguous terms of the telegrams. The plaintiffs' reply did not unconditionally accept the terms of defendants' message. It offered to buy only a portion of the 500,000 gallons of wine mentioned in defendants' telegram. If it may be deemed to be a valid acceptance upon the exact terms and conditions specified, plaintiffs' reply message recognizes that the sale was to be consummated on samples to be furnished, and that the completed contract was to be expressed in a subsequent formal written agreement. Plaintiffs' reply message says in that respect, "Prepare sales contract and ship samples at once." Plaintiffs also recognize the fact that their telegram was not an unconditional acceptance of defendants' terms, for they say, "Wire today confirmation sale sweet wine to us."

It is therefore evident that the two telegrams were not intended by the parties to be a completed contract of purchase and sale of the wines. They constitute mere evidence of incompleted negotiations which were to be consummated by a subsequent formal written agreement to be signed by the parties. No formal written contract was ever signed taking the transaction out of the statute of frauds.

I am in hearty accord with the principles announced in *Eagle Oil & Ref. Co.* v. *Prentice,* 19 Cal.2d 553, 556 [122 P.2d 264], to the effect that a summary judgment is a harsh remedy which should be granted only with caution lest injustice may result therefrom, and that the affidavits of the party resisting the motion should be liberally construed to afford him a trial when the merits warrant it.

It is true that a telegram offering to sell personal property, which contains all the necessary terms and conditions of sale, including sufficient identification of the quality, quantity and price of the goods, to which offer a message of unconditional acceptance of all the terms thereof is sent, may constitute a completed enforceable contract fulfilling the requirements of the statute of frauds. (*Breckinridge* v. *Crocker,* 78 Cal. 529 [21 P. 179] ; 12 Cal.Jur. 899, §§ 63 and 64; 1 Williston on Contracts (rev. ed.) 240, § 83.)

In 2 Jones Commentaries on Evidence (2d ed.) 1476, section 805, it is said in that regard:

"When a contract is made by telegraph, which contract must be evidenced by writing under the statute of frauds, . . . and the other party accepts it by telegram, that constitutes a contract in writing under the statute of frauds."

But the memorandum must contain all the essential elements and terms of the contract. In the Breckinridge case, *supra,* the court said:

"A memoradum of the agreement is sufficient, and it may be found in one or more papers, some or all of which may be telegrams. *But the memorandum must contain all the material elements of the contract.''* (Italics added.)

In 37 Corpus Juris Secundum, page 683, section 196, subdivision a, the text which is amply supported by authorities reads:

"Since one object of the statute of frauds is to prevent disputes as to the terms of sale, a memorandum of an agreement of sale must show the terms and conditions of sale. The memorandum of agreement must contain within itself, or by reference to some other written evidence, *all the essential terms and all the essential conditions of the sale and purchase which the parties made,* expressed with such reasonable certainty that they may be understood from the memorandum and other written evidence referred to, if any, without any aid from parol testimony." (Italics added.)

Oral evidence is admissible to explain the meaning of terms or expressions, used in the memorandum of a contract, *which are uncertain or ambiguous.* (12 Cal.Jur. 902, §65.) But oral evidence is not competent to prove material alterations, modifications or omitted terms of the written proposal to sell unless the changes are subsequently accepted or ratified.

The offer of defendants in this case to sell the wine is not defective in omitting to state the time when the purchase price shall be paid. The statute supplies that omission. When the time for payment of the purchase price of personal property is not mentioned in the contract, the law requires the payment to be made at the time of delivery. (Civ. Code, § 1762; *Gilfallan* v. *Gilfallan,* 168 Cal. 23 [141 P. 623, Ann.Cas.1915D 784]; *Southern Pacific Milling Co.* v. *Billiwhack Stock Farm, Ltd.,* 50 Cal.App.2d 79 [122 P.2d 650].)

It is doubtful, however, whether defendants' telegram may be considered as a definite offer to sell wine at specified prices. It does not say ''We will sell you'' specified quantities of wine for quoted prices. It merely says ''Find it necessary to ask'' specified prices. A binding offer to sell property should be couched in language that may be enforced *as a definite promise.* Language similar to that which was used in defendants' telegrams, to wit, *''Find it necessary to ask* for following prices,'' has been held not to constitute an enforceable promise or offer to sell property for the prices mentioned. Such language as ''I am asking 23 cents per pound'' for red clover, and ''I want $2.25 per cwt.'' for millet seed, have been held not to constitute enforceable contracts for lack of definite offers. (*Courteen Seed Co.* v. *Abraham,* 129 Ore. 427 [275 P. 684]; *Nebraska Seed Co.* v. *Harsh,* 98 Neb. 89 [152 N.W. 310, L.R.A.1915F 824]; *Brillhart* v. *Beever* (Tex.Civ.App.), 198 S.W. 973.)

It is true that when an oral agreement or a telegram *contains all of the essential terms and conditions of a completed contract,* according to the intentions of the parties, it may be enforceable, if it is not barred by the statute of frauds, notwithstanding the fact that it is agreed that a subsequent formal contract shall be reduced to writing. (*Clarke* v. *Fiedler,* 44 Cal.App.2d 838 [113 P.2d 275].) But when the preliminary negotiations evidenced by telegrams from which essential terms or conditions are eliminated, and the language of both the offer and acceptance clearly indicates that the parties contemplated the execution of a subsequent more formal written agreement, the telegrams may not be construed to constitute a valid enforceable contract. (1 Williston on Contracts (rev. ed.) 59, § 28; *Fly* v. *Cline,* 49 Cal.App. 414, 425 [193 P. 615]; *Durst* v. *Jolly,* 35 Cal.App. 184, 189 [169 P. 449]; *Patterson* v. *Clifford F. Reid, Inc.,* 132 Cal.App. 454,

456 [23 P.2d 35]; *Spinney* v. *Downing*, 108 Cal. 666 [41 P. 797]; 122 A.L.R. 1252, note.)

In the Fly case, *supra*, the court says in that regard:

"It also is elementary law that, unless the agreement to execute the future contract be definite and certain upon all the subjects to be embraced, so that nothing is left for future negotiation, it is nugatory."

In the elaborate note found in 122 American Law Reports at page 1252, on the subject of the necessity for the execution of a formal written contract, supported by numerous authorities, including several from the jurisdiction of California, it is said:

"There are numerous cases supporting the rule that where the terms of a contract, or the conditions under which it is to become effective, are not fully and definitely settled in the preliminary negotiations, and a written or more formal contract embodying the completed contract is contemplated, no valid and enforcible contract exists until the execution of the written or more formal instrument."

It is true, as stated in the majority opinion, that when the language which is used in a note or memorandum to take the case out of the statute of frauds "is uncertain or ambiguous," parol evidence is admissible to show the intention of the parties. That is the full extent to which the cases cited in the majority opinion go. In the Brewer case, in 127 Cal. at page 643 [60 P. 418, 50 L.R.A. 240], cited in the majority opinion, oral evidence was received to interpret obscure language used in a telegram which merely said "Bought thirteen at eleven five-eighths net you; . . . Do you want fifteen at eleven quarter." Clearly that language is ambiguous and requires interpretation. Without explanation it is meaningless. No such unintelligible and obscure language appears in the telegrams involved in the present case. The true rule is also announced by the Supreme Court in the Balfour case in 109 Cal. at page 221 [41 P. 876], cited in the majority opinion. It quotes with approval from the case of *Sandford* v. *Newark etc. R. R. Co.*, 37 N.J.L. 1, 3, as follows:

"When any doubt arises upon the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and ascertained by evidence *dehors* the instrument itself."

To the same effect are the other cases cited in support of that rule authorizing the use of oral evidence to explain uncertain or ambiguous language appearing in written instruments. But that rule does not justify the emasculation or elimination of clear and unambiguous terms to replace them with oral explanations in absolute conflict with the language used.

In the present case it seems clear from the telegrams that both parties contemplated the reduction of their negotiations to a formal written contract. Moreover, the material terms which were expressed in the telegrams may not be eliminated or construed by subsequent oral statements to mean something contrary to what their clear language imports.

I am of the opinion the oral statements contained in plaintiffs' affidavits, which were stricken from the record, would be incompetent evidence at a trial because they tend to vary the terms of the telegrams. It was therefore harmless to strike them from the affidavits. Under no circumstances, as I view the record, have the plaintiffs a valid cause of action based upon a written contract which is not barred by the statute of frauds.

Conceding that a summary judgment is a harsh proceeding, and that it should not be granted except upon a clear showing of a lack of merit as provided by section 437c of the Code of Civil Procedure, I am impelled to conclude that the plaintiffs have no valid cause of action, that it would therefore be idle to send the case back for trial, and that the trial court did not err in granting the motion for summary judgment. Our courts definitely hold that when there is no valid question of fact involved, and the record discloses as a matter of law a clear lack of merit, the court is bound to grant the motion for a summary judgment. (*Bank of America* v. *Casady,* 15 Cal.App.2d 163, 168 [59 P.2d 444].) In the case last cited the court said:

"It may be conceded at the outset that on a motion for summary judgment the allegations of fact made by defendants in their affidavits must be accepted as true, and that the primary question for the court to decide is whether the affidavits, when so viewed, raise an issue of fact. If an issue of fact is raised, then a summary judgment is improper, and the case must proceed to trial. (*Krieger* v. *Dennie,* 123 Cal.App.Supp.

777, 780 [10 P.2d 820].) *If, however, the facts as averred are accepted and create only an issue of law, the court is bound, under the provisions of section 437c, to render a judgment on motion.''* (Italics added.)

To the same effect are the cases of *Bromberg* v. *Bank of America,* 58 Cal.App.2d 1 [135 P.2d 689], and *Hardy* v. *Hardy,* 23 Cal.2d 244 [143 P.2d 701].

For the foregoing reasons I am persuaded the judgment dismissing plaintiffs' cause of action should be affirmed.

A petition for a rehearing was denied November 29, 1944, and respondent's petition for a hearing by the Supreme Court was denied December 28, 1944.