[Civ. No. 1277. Third Appellate District.—February 2, 1915.]

## B. CARRINGTON, Respondent, v. GEORGE E. SMITHERS et al., Appellants.

CONTRACTS — BROKER'S COMMISSION — EXCHANGE OF REAL PROPERTY — EXECUTION SUBSEQUENT TO PERFORMANCE OF SERVICES—STATUTE OF FRAUDS.—A written agreement to pay a real estate broker a certain sum of money for services in effecting an exchange of real property executed after the full performance of the services but before the exchange was fully consummated is valid under the statute of frauds, as the performance of such services constitutes a sufficient consideration to support the subsequent promise.

ID.—INABILITY OF OWNER TO CONVEY—RIGHT OF BROKER TO COMMISSION.—A broker through whose efforts a binding contract is made between his principal and the owner of the land has earned his commission, notwithstanding the fact that the owner cannot make a good title to the land because of encumbrances not known to the broker, as the remedy of the principal is against the other party to the contract.

APPEAL from a judgment of the Superior Court of Sonoma County. Emmett Seawell, Judge.

The facts are stated in the opinion of the court.

T. J. Butts, and Robert M. Ford, for Appellants.

Rolfe L. Thompson, for Respondent.

BURNETT, J.—The suit was for a broker's commission for services in effecting an exchange of real property in Sonoma County belonging to defendants for four houses and lots in Berkeley and Oakland. That the exchange was made in accordance with the expressed desire and intention of defendants, that the efforts of plaintiff were the procuring cause of the exchange within the contemplation of the well-settled rules relating to such matters, that plaintiff was employed for the purpose mentioned and that defendants promised to pay him the amount claimed cannot be gainsaid, in view of the evidence disclosed by the record.

As to the services performed we find the following: Plaintiff testified: "On the 29th of September, 1911, Mr. Smithers came in and listed the ranch and after that date I wrote to C. A. Runels and Alfred Wehe & Co., Oakland, that I had the property for exchange and Mr. Runels came up and I took my machine and we went out to the ranch and after we came back Mr. Runels took the purchaser up to the ranch and made the deal, closed the deal that day. I made several trips to Oakland. I made one trip to the ranch. After I had been out to the ranch on or about April the 28th, Mr. and Mrs. Smithers came into my office and talked with me about the exchange there. With reference to selling the place to Doyle, I visited the ranch with Runels and Runels brought Doyle up here. That is the way Runels found out about the ranch through me. He is my correspondent in Oakland. Doyle was his son-in-law. He brought Doyle and Mr. Wehe and Mr. Wehe's brother. I learned about the property that the Smithers were trading their ranch for the day they came up here, the day that Runels and Wehe and Doyle came up in a machine from Oakland they told me about the property. I saw Mr. Smithers on or about the 29th of September, 1911. At that time we had a written agreement."

C. A. Runels testified: "My occupation is a real estate broker with Alfred Wehe & Co. I know Mr. and Mrs. Smithers, the defendants in the case. I also know Henry C. Doyle, he is my son-in-law. I know Mr. B. Carrington, the plaintiff. I had some negotiations with Mr. and Mrs. Smithers, respecting the exchange of Oakland or Alameda property for their ranch in this county. Mr. Carrington wrote me in regard to their ranch. Mr. Carrington sent a description of this ranch, said it was for exchange and suggested a piece of property

which he had seen on Telegraph Avenue as a possible exchange and asked me to see the people and if I could bring them up. I went and saw them and described the ranch to them according to Mr. Carrington's description and got them to come up and look at that. We met Mr. Carrington here in Santa Rosa at his office and he took his machine and took us out to the ranch, showed us the ranch. Those people did not make the exchange. Then it was suggested that we make the exchange on this other property with Mr. Doyle, and we went up and looked at the property. We took our machine from Oakland, came up, met Mr. Carrington at his office. We talked over the proposition and how the deal could be made and we went out and looked at the ranch and entered into the contract. I think that was somewheres along in April, about the 28th of April. Each party had a copy of that contract.'' There is other evidence to the same effect, including admissions of the defendants, but the foregoing is amply sufficient to show that plaintiff acted as the agent of defendants in the transaction culminating in the exchange.

One question, however, that gives rise to serious contention is whether the contract of plaintiff and defendants was valid within the statute of frauds. Although pitiable efforts were made by defendants to deny the same, the evidence shows that they executed the following agreement in writing: ''Santa Rosa, Sonoma Co., Cal., April 30th, 1912. This is to certify that we, the undersigned, do hereby agree to pay B. Carrington the sum of seven hundred dollars in cash, or should we fail to pay the cash by the time we close the deal now pending between us and Henry C. Doyle of Oakland, we will give said B. Carrington a mortgage at 7 per cent interest on that certain lot owned by us in Oakland, Alameda County, Cal. Being on 10th Street East side, 217 ft. North of Snyder Ave. or at option of B. Carrington we will make said mortgage on one of the properties we are obtaining from Henry C. Doyle in Oakland or Berkeley, Alameda County, Cal. The above amount is for services rendered. This is provided the trade with Henry C. Doyle is consummated.''

The original agreement of September 29, 1911, does not appear in the transcript, although Mr. Carrington, as we have seen, testified that it was in writing. Apparently, plaintiff relies upon said writing of April 30 to satisfy the requirement of the statute of frauds. This was executed after plain-

tiff's services were performed but before the exchange was fully consummated.

Section 1624 of the Civil Code provides: "The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged, or by his agent: . . . 6. An agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation or a commission."

It is manifest that the said agreement in writing is sufficient in form to satisfy the requirement of the statute. A "note or memorandum" of the contract is all that is required. We have here a definite promise to pay the amount of the commission and the other terms are either certain or can be made certain by reference to the situation of the parties. It is true that it required the exchange to be consummated before the commission should be payable. But we need not stop to enquire whether this requirement would be satisfied if the agent obtained a purchaser ready, willing, and able to make the exchange, for the reason that the evidence shows, as alleged in the complaint, that "plaintiff at his own expense, procured an exchange between defendants, to one Henry C. Doyle, of the properties heretofore mentioned, in accordance with the terms of said agreement and upon terms acceptable and accepted by defendants." In other words, the exchange was entirely effected.

But there is undoubtedly some merit in the objection that said written promise to pay the seven hundred dollars was executed after virtually all the services of plaintiff had been performed. It is true that the deeds did not finally pass until the latter part of May but the written agreement of exchange was executed April 27 and the services of plaintiff reached then their culmination. We think, however, that the rule announced by the supreme court of Washington, in *Muir* v. *Kane*, 55 Wash. 131, [19 Ann. Cas. 1080, 26 L. R. A. (N. S.) 519, 104 Pac. 153], should be recognized as valid. Therein it is said: "The moral obligation to pay for services rendered as a broker in selling real estate under an oral contract, where the statute requires such contract to be in writing, is just as binding as is the moral obligation to pay a debt that has become barred by the statute of limitations; and there is no reason for holding that the latter will support a new promise to pay while the former will not. There is no moral delin-

quency that attaches to an oral contract to sell real property
as a broker. This service cannot be recovered for because
the statute says the promise must be in writing, not because
it is illegal in itself. It was not intended by the statute to
impute moral turpitude to such contracts. The statute was
intended to prevent frauds and perjuries, and, to accomplish
that purpose, it is required that the evidence be in writing;
but it is not conducive to either fraud or perjury to say that
the services rendered under the void contract or voluntarily
will support a subsequent written promise to pay for such
services.''

The services performed by plaintiff would seem to be a suf-
ficient consideration to support the subsequent promise within
the contemplation of our own statute. Sections 1605 and
1606 of the Civil Code. Said services constituted a ''benefit
conferred'' upon ''the promisor'' to which the latter was
''not lawfully entitled,'' and they assuredly created ''a moral
obligation originating in some benefit conferred upon the
promisor'' as well as in ''prejudice suffered by the promisee.''

In an extended note to the Muir case, as reported in 26
L. R. A. (N. S.) 519, may be found an interesting discussion
of the question, wherein it is said: ''The courts, however,
should be astute to find some means of enabling one to re-
cover under such circumstances, where there was not merely
the detriment to him, but a positive benefit of a material and
pecuniary nature to the other party; and it seems like flying
in the face of Providence to reject the opportunity to do sub-
stantial justice between the parties, afforded by the subse-
quent express promise.'' And the author thinks that to make
the subsequent promise binding where the services were per-
formed under an invalid contract it should appear: 1. That
the service moving from the promisee conferred an actual
material or pecuniary benefit on the promisor; 2. That the
promisee expected to be compensated therefor, and did not
intend it as a mere gift or gratuity; 3. That the circumstances
were such as to create a moral obligation on the part of the
promisor; 4. That the benefit received has not constituted the
consideration for another promise already enforced or still
legally enforceable.

The foregoing conditions are all present in the case at bar
and it is believed that the promise is not invalidated by the
fact that the original agreement may have rested in parol.

In support of this view, we may also cite *Mohr* v. *Rickgauer,* 82 Neb. 398, [26 L. R. A. (N. S.) 533, 117 N. W. 950], and *In re Balfour & Garrette,* 14 Cal. App. 261, [111 Pac. 615]. The last case seems decisive of this controversy. Therein the question of the statute of frauds is thoroughly considered and it is said: "The provisions of the statute, in other words, affected the remedy—that is, in effect deprived the party seeking to enforce a contract coming within their purview of his right of action if such contract were not in writing," and it was held that although the creditor was originally employed under an invalid oral contract to sell lands upon commission, yet when after certain sales were made the debtor gave him a written memorandum setting forth the sales made and the commission allowed therefor, such written memorandum was sufficient to relieve the whole transaction of sales from the operation of the statute of frauds.

It is true that the complaint proceeds upon the theory that the services were performed under said contract of April 30 instead of before and the findings in that respect follow said pleading, but this would seem to be a technical inaccuracy that resulted in no substantial injustice. In fact, appellants did not make the point in the court below, nor was any question of variance submitted to the trial judge. The motion for a nonsuit was made on the ground and for the reason appearing in the record as follows: "The law is elementary in this case, that to enable a broker to recover his commission for the service rendered he must furnish a buyer that is ready, able and willing. They did not furnish any buyer that was ready, able and willing. They furnished a man who, it is admitted did not have any interest in it at all to make a contract, who did not have any title to the land, never did have. The lands were exchanged. He never had any title. He was not able to contract; and before he can collect his commission he must furnish a man that is a purchaser, who is ready, able and willing to buy."

This motion of defendants was based upon the fact that at the time the trade was negotiated by Doyle he did not own the property in Alameda County, but it is not apparent what possible difference it could make to appellants since the trade was actually consummated and the title to said property vested in them in accordance with their said agreement with

Doyle. The fact is that Doyle represented the owners and by them the property was conveyed afterward to him who in turn conveyed it to Smithers. The effect, of course, is the same as though the negotiations were had directly with the owners and they had executed the conveyance to Smithers without the intermediation of Doyle. The exchange of the property, it may be said also, was no less the result of plaintiff's efforts than if he had in the beginning brought the owners of the Alameda County property face to face with appellants and his claim for commission is no less meritorious.

There is some contention that the title conveyed to Smithers was subject to a certain lien contrary to the agreement of the parties, the contract between Doyle and Smithers providing that, save certain mortgage liens therein specified, "titles to above properties are to be good and certificates of title to each property to be arranged by the respective owners thereof." There was a lien for some six hundred dollars for taxes against a part of the Alameda County property and the evidence shows that it was paid and discharged, before this suit was brought, by the parties whom Doyle represented. So that, before the beginning of this action, title was vested in Smithers in accordance with his contract. He had entered into possession of the property and was enjoying the rents thereof and he was not injured by the delay in the discharge of said lien. As a matter of fact, its existence was probably unknown to all the parties, as the abstracts showed the title clear. It was the fault of the abstract company that the tax liens did not appear. At any rate, as no time limit for making the title good was prescribed in the contract, a reasonable time would be allowed and this requirement of the law was satisfied.

But, aside from the foregoing, as far as this point is concerned, plaintiff would be entitled to recover under the principle stated in *Roche* v. *Smith,* 176 Mass. 595, [79 Am. St. Rep. 345, 58 N. E. 152, 51 L. R. A. 510], as follows: "A broker, through whose efforts a binding contract is made for land between his principal and the owner of the land, has earned his commission, notwithstanding the fact that the owner cannot make a good title to the land because of encumbrances not known to the broker as the remedy of the principal is against the other party to the contract." The contract was made in this case after an examination of the

title by defendants' attorney and there is no question that plaintiff acted in good faith in the transaction. The ground upon which the liability attaches in such instances is stated to be that, ''by entering into a valid contract with the customer produced by the broker, the principal accepts the customer as able, ready and willing to buy the land and pay for it. In such a case, the decision would have to be the other way, were it not that by entering into the contract with him the principal accepts the customer produced by the broker.''

A similar statement of the controlling principle is found in 19 Cyc. 270 as follows: ''If the principal and the customer found by the broker enter into a valid contract and the broker acts in good faith, the broker is not deprived of his right to a commission by the fact that the customer fails to carry out the contract.''

To such a situation is also applicable the doctrine of estoppel set forth in 4 Ruling Case Law 49, as follows: ''Once the customer procured by the broker is accepted by the employer, the latter is thereafter estopped from denying the purchaser's ability or willingness to complete the contract, inasmuch as he is not bound to accept the offer of such person without a reasonable opportunity to inquire and satisfy himself in relation to it. Consequently his acceptance should estop him from alleging anything against the claim except fraud on the part of the broker in inducing the acceptance.''

In the case at bar there was not only no fraud on the part of the broker but all parties seem to have acted in the utmost good faith. It is not claimed, indeed, that there was any advantage taken of defendants or any deceit practiced. In fact, they had investigated the property in Alameda County and were anxious to make the exchange.

Some criticism is made of the findings of the court but we do not think extended notice of this is required. There are manifestly some clerical errors therein and it is not strictly accurate that plaintiff's services were performed under said contract of April 30, 1912, but sufficient facts are found, within the theory already suggested, to support the judgment. It may be said, indeed, that the action was tried upon the assumption that that theory was embraced within the pleadings, as no objection was made upon the ground of variance or that said written promise was for services al-

ready performed and not for those to be performed in the future.

We think the judgment should be affirmed and it is so ordered.

Chipman, P. J., and Hart, J., concurred.