[L. A. No. 20770. In Bank. May 10, 1949.]

WALTER N. MARKS, Respondent, v. WALTER G. McCARTY CORPORATION (a Corporation), Appellant.

Macfarlane, Schaefer & Haun, Henry Schaefer and William Gamble for Appellant.

Adams, Duque & Hazeltine, A. Andrew Hauk, John W. Preston and Henry Duque for Respondent.

SHENK, J.—The plaintiff sued to recover broker's commissions for procuring the sale of the Beverly-Wilshire Hotel, its furniture and equipment. Judgment for the plaintiff was entered in the sum of $57,500 as commissions on the sale of both the real and personal property. The defendant appealed.

The defendant corporation was the owner of the hotel property until it was sold in 1944. The corporate stock was owned by Walter G. McCarty and his wife. McCarty, the president, had authority to negotiate the sale of the property. In October, 1943, a meeting was arranged by O'Neill, the manager of the Beverly-Wilshire, between the plaintiff, a licensed real estate broker, and McCarty. At that meeting McCarty said that the hotel and furnishings were for sale at a price of $2,000,000, and that a commission of 5 per cent would be paid. The plaintiff said he was very much interested in the deal and had in mind a prospective purchaser or syndicate of pur-

chasers. McCarty gave the plaintiff an unsigned typewritten document headed: "Re Beverly Wilshire Hotel—October 14, 1943," which set forth a description of the property and the sale price and terms. McCarty had listed the property in this manner with at least 20 brokers, but had not given an exclusive agency to any of them. McCarty also instructed O'Neill to show the plaintiff the hotel and to furnish him with financial statements of its operations.

The plaintiff began to work on the deal immediately by contacting a number of prospects. Through his attorneys the plaintiff contacted Arnold Kirkeby, a Chicago hotel operator, in the month of October, shortly after his first meeting with McCarty. Kirkeby, the ultimate purchaser, manifested interest in participating in the purchase and operation of the hotel. Numerous telephone calls and correspondence between the plaintiff or his agents and Kirkeby ensued. It was proposed by the plaintiff that Kirkeby participate with a syndicate in the purchase, and there was discussion as to the percentage of interest he would take. During these negotiations the plaintiff met with McCarty two or three times a week. The plaintiff testified that in November, 1943, he told McCarty that Kirkeby was to be a member of the purchasing syndicate.

In February of 1944, McCarty informed the plaintiff that the sale price was being raised from $2,000,000 to $2,250,000. At that time McCarty gave the plaintiff a carbon copy of a typewritten document on letterhead stationery with a picture of the hotel at the top underneath which was printed: "The Beverly-Wilshire Hotel, Walter G. McCarty Corporation." This document contained the price of the hotel ($2,250,000), the terms of sale, and a provision for a broker's commission fixed at $57,500 (5 per cent on the first $50,000 and 2½ per cent on $2,200,000). In reading the agreement the plaintiff noted that the broker's commission had been reduced from the sum previously indicated. According to his testimony, the plaintiff protested that it seemed unfair for McCarty to raise the price of the hotel and thus make the deal harder to consummate and at the same time reduce the commission. When McCarty told him other brokers were willing to receive a commission of $57,500, the plaintiff agreed to work for that figure.

Thereafter the plaintiff renewed his efforts to form a syndicate, which was to include Kirkeby, for the purpose of buying the hotel. The plaintiff testified that on April 17, 1944, he

told McCarty that he had hopes that the deal could be closed but that he wanted something in writing so that the terms would be confirmed. McCarty wrote the terms in longhand on a sheet of yellow paper which he handed to the plaintiff. The sheet was dated April 17, 1944, and headed: ''Kirkeby deal—Walter Marks, Broker.'' The heading was followed by the sale terms and at the bottom was written: ''Commission to Broker $57,500 payable at close of escrow.'' A few corrections were made by the plaintiff which McCarty approved.

From April through July the plaintiff and Kirkeby frequently discussed the possible purchase but no definite agreement was reached, principally because of Kirkeby's dissatisfaction with the mortgage payments required by McCarty's proposal. The plaintiff sought to bring others into the deal to assist in the financing. One arrangement seemed promising to Kirkeby, and at the plaintiff's urging, he came to Los Angeles about August 1, 1944. The plaintiff had told McCarty in the latter part of July that he was bringing Kirkeby to Los Angeles.

The plaintiff met Kirkeby when he arrived and arranged a meeting between Kirkeby and a prospective member of the purchasing syndicate. At this stage discussions centered around a syndicate in which Kirkeby would acquire a half-interest. However these negotiations collapsed and in a private conversation the plaintiff suggested that Kirkeby purchase the property alone. Kirkeby said that perhaps he would. He stated he wanted to see McCarty alone. The plaintiff made an appointment with McCarty for Kirkeby and loaned the latter his car to drive to McCarty's ranch. Afterward Kirkeby told the plaintiff that he was pleased with the meeting and he thought that he and McCarty had reached an agreement as to price and terms. About that time, however, Kirkeby received word that a New York hotel in which he was interested had been offered to him at a favorable price and he decided to leave Los Angeles without proceeding further on the Beverly-Wilshire deal. The plaintiff said he ''would continue to watch the deal'' for Kirkeby and the latter stated ''he would continue to keep his interest in the Beverly-Wilshire Hotel, and any information I [the plaintiff] could give him he would be glad to get.'' In November, 1944, Kirkeby, dealing directly with McCarty, purchased the hotel and furnishings on price and terms substantially the same as those agreed upon in August.

From these facts it may readily be seen that there was evidence to support the finding of the trial court that the plaintiff was employed as a broker on commission in the sale of the real and personal property known as the Beverly-Wilshire Hotel. There was also evidence from which the court could properly find that the plaintiff was the procuring cause of the sale. The defendant challenges this finding by reference to evidence that negotiations between Kirkeby and McCarty took place before the plaintiff became involved in the transaction. It appears that McCarty had intermittently spoken to and corresponded with Kirkeby between 1939 and 1942 about a possible sale of the hotel. But these negotiations were terminated on November 13, 1942, a year before the plaintiff began to work on the deal, when Kirkeby wrote McCarty: "Our views are so far apart both as to price and terms, I do not believe it would be worth while for us to continue the negotiation." Although the plaintiff did not introduce Kirkeby and McCarty and was not the first to call Kirkeby's attention to the fact that the hotel was for sale, the finding that the plaintiff was the efficient cause of the sale can be supported by the evidence which shows that only through his efforts over a period of many months were the parties brought together in August, 1944, when terms and price were settled. (*Webster* v. *Parra,* 72 Cal.App. 639, 648 [237 P. 804]; 12 C.J.S. § 91, p. 210.) It has been shown that negotiations did not come to an end in August, for Kirkeby, although then short of capital, stated he would continue his interest in the hotel. Less than three months later the sale was closed at the August price. It was therefore reasonable to conclude that the plaintiff brought about the sale, and the fact that he was not present when the sale was consummated is immaterial. (*Williams* v. *Kinsey,* 74 Cal.App.2d 583 [169 P.2d 487]; *Pryor* v. *McGuire,* 59 Cal.App. 234 [210 P. 532]; see *Fitzpatrick* v. *Underwood,* 17 Cal.2d 722, 733 [112 P.2d 3].)

To recover a commission on a contract authorizing a broker to sell real estate, the broker must prove not only the existence of an agreement and procurement of a willing purchaser but must meet the requirements of the statute of frauds which declares that such an agreement "is invalid unless the same or some note or memorandum thereof be in writing and subscribed by the party to be charged, or by his agent." (Civ. Code, § 1624(5); Code Civ. Proc., § 1973(5).) It is the defendant's principal contention that the plaintiff cannot recover a commission for the sale of the real property because there

was no written contract or memorandum subscribed by the party to be charged. A scrutiny of the documents relied upon by the plaintiff as together constituting a sufficient memorandum immediately discloses that they are lacking in one statutory essential, namely, the signature of the party to be charged.

■ However, the plaintiff contends that the letterhead "The Beverly-Wilshire Hotel, Walter G. McCarty Corporation" printed on the typewritten document given the plaintiff in February of 1944 by McCarty is a sufficient signature. The statute of frauds does not demand that the signature of the party to be charged be placed at the end of the writing relied upon if a proper signature be found elsewhere on the instrument. (*California Canneries Co.* v. *Scatena,* 117 Cal. 447 [49 P. 462] ; 49 Am.Jur. § 380, p. 683; 112 A.L.R. 937.) ■ Furthermore the signature need not be manually affixed, but may in some cases be printed, stamped or typewritten. (171 A.L.R. 334; 49 Am.Jur. § 377, p. 680; Rest., Contracts, § 210.) ■ But it is a universal requirement that the statute of frauds is not satisfied unless it is proved that the name relied upon as a signature was placed on the document or adopted by the party to be charged with the intention of authenticating the writing. In other words the defendant must intend to appropriate the name as a signature. (*McNear* v. *Petroleum Export Corp.,* 208 Cal. 162 [280 P. 684] ; *Little* v. *Union Oil Co.,* 73 Cal.App. 612 [238 P. 1066] ; *Sherwood* v. *Lowell,* 34 Cal.App. 365 [167 P. 554] ; 49 Am.Jur. § 381, p. 683; Rest., Contracts, § 210.)

This requirement has been well stated by the New York Court of Appeals, Cardozo, Chief Justice, in an opinion holding that the printed name of the defendant on its order form was not a signature which would satisfy the statute of frauds: "We may, indeed, infer from the delivery of the writing that the defendant intended to assume the obligation of a contract, whether the document was signed or unsigned. It might have intended as much if there had been no writing whatever. It may even have supposed that a writing was unnecessary. Something more must be found before the statutory requirements can be held to be obeyed. The defendant must have intended not merely to contract, but to sign. We see no mark of such purpose." (*Mesibov, Glinert & Levy* v. *Cohen Bros. Mfg. Co.,* 245 N.Y. 305, 311 [157 N.E. 148] (1927). See, also, *Lee* v. *Vaughan's Seed Store,* 101 Ark. 68 [141 S.W. 496, 37 L.R.A.N.S. 352] ; *Dorian Holding & T. Corp* v. *Brunswick T. & Ry. S. Co.,* 230 App.Div. 514 [245 N.Y.S. 410].) ■ There

is nothing on the face of the proffered documents which would indicate that McCarty intended to adopt the letterhead as a signature of the corporation. The letterhead is found on a carbon copy of a typewritten sheet which sets forth terms for the sale of the hotel but which bears no signature. This was the form used by McCarty in listing the property with numerous brokers. The other documents, one typewritten, the other written in McCarty's hand, have neither signature nor letterhead. In *McNear* v. *Petroleum Export Corp., supra,* 208 Cal. 162, this court held that where it is claimed that a name appearing on a document was intended as a signature satisfying the statute of frauds, the intention must appear on the face of the document itself and ''proof of such intention may not rest in parol.'' The rule stated in that case would seem to dispose of the plaintiff's claim without need of further discussion because of his failure to produce a memorandum with some mark of authenticating intention on its face. The plaintiff insists, however, that parol evidence was admissible on the issue of whether McCarty intended to adopt the letterhead as a signature.

 Even if it be assumed that parol evidence is admissible no evidence appears in the record which would support the findings and judgment granting commissions on the sale of the real property. Cited by the plaintiff as significant are the facts that the writing was a carbon copy, yet on letterhead stationery, that it was delivered to the plaintiff as a broker, and that it was the defendant's custom to list the property with brokers in this manner which contemplated the payment of a commission. At most this evidence discloses an intention on the part of McCarty to contract; it does not reveal an intention to appropriate the letterhead as the defendant's signature.

 Testimony of McCarty on cross-examination is relied upon by the plaintiff as evidence of his intention to adopt the letterhead as the corporation signature. That testimony is obviously insufficient. ''Q. Well, what was your intention when you gave out letters on the stationery of the Beverly-Wilshire Hotel, which were obviously carbons of an original letter? A. I again state I could not answer that. It is very possible in giving this to the various brokers, having a picture of the hotel on it, it was something from which they could see what the hotel was and so forth. That is the only explanation I could add. . . . Q. Well, as a matter of fact, Mr. McCarty, wasn't the purpose of having this letter or this memo-

randum typed on Beverly-Wilshire stationery and the copies given to brokers, wasn't the purpose of that to authenticate this memorandum and show that it was from the Beverly-Wilshire Hotel and not from anyone else? A. I don't know— I don't believe I understood your question. Q. Well, I will reframe it then. A. All right. Mr. Duque: Would you read it? (Question read.) A. Well, as to the Beverly-Wilshire Hotel, I would have to answer no. It was from my office. Q. Well, was it the purpose of having it on the Walter G. McCarty Corporation stationery for the purpose of authenticating it and showing that it came from your corporation; wasn't that the object of having it on that stationery? A. Well, I wouldn't say that it was. If you write a letter, any letter, you wouldn't use somebody else's stationery. I write it on my own letterheads. Q. Well, do you customarily use your own letterheads for carbon copies of letters? A. Not for general letters that I write out. I might have in a case where I am trying to sell a piece of property. This shows a picture of the hotel on there, and I put it on all of my carbon copies. Q. That is just my point, and that is just why I am asking you, isn't it a fact that contrary to your usual custom of using yellow paper for carbon copies, in this instance you were selling a hotel and you wanted to authenticate the memorandum which you were giving out to the brokers, so you had the memorandum typed and all the copies of the memorandum typed on your own corporate stationery; wasn't that the reason? A. Well, that is probably the reason. Q. And isn't that the fact, isn't that what you did? A. Well, I don't know. I might have had some not on my letterhead, or might have sent out some of those memorandums not on my letterhead. I don't think I did. I have no recollection of that.''

This testimony was elicited on cross-examination by counsel to establish his theory of authentication. Rather than tending to prove adoption of the letterhead as a signature, it shows that if McCarty had any purpose in mind in using the letterhead it was to identify the contractual terms on the stationery as relating to the proposed sale of the Beverly-Wilshire Hotel, since copies were to be distributed to a number of brokers.

The wisdom of adhering to the statute of frauds by declaring the memorandum in this case inadequate is apparent. Here the defendant's letterhead was printed on its stationery at some earlier time for a purpose unconnected with the transaction in suit. The four corners of the document give no in-

dication of an intent to adopt the letterhead as a signature. Sympathetic consideration for the plaintiff because of the absence of a writing ''subscribed'' as required by the statute is not enough. A decision in his favor would in effect repeal the statute of frauds and open the way for the assertion of false claims resting entirely in parol. The protection intended to be afforded by the statute would be lost.

The plaintiff was experienced in real estate deals, having handled more than 100 such transfers as a licensed real property broker over a period of 17 years. He testified that he knew the law required a broker to have an agreement in writing signed by the seller before he could enforce his claim to a commission. When asked by counsel why he didn't request a signed memorandum of McCarty the plaintiff answered: ''I didn't think it was necessary at that time. I thought his word was sufficient. I had not, as a rule, taken and asked for a written commission agreement; I don't remember of ever actually doing it in my entire experience in the real estate business.'' Thus the plaintiff failed to procure a signature of the defendant's agent McCarty, although it seems clear that the latter, a real estate broker himself, did not sign because he did not intend to sign. The plaintiff, a man of experience in this line of business, knew how to protect himself in the transaction but failed to do so.

Although the plaintiff is prevented by the statute of frauds from recovering a commission on the sale of the real estate there is no such barrier in this case to his recovery of a commission on the sale of the personal property as to which no written memorandum is required. It is contended by the defendant that McCarty would not have sold the furnishings apart from the hotel and that the commission agreement is therefore entire and void *in toto*. It may be conceded that as between the parties to the purchase the contract was indivisible. As between broker and selling party, however, the broker's right to a commission depends, not on whether the real and personal property would have been separately sold, but on whether the sale price of the personal property actually sold can reasonably be ascertained. (*Dabney* v. *Edwards,* 5 Cal.2d 1, 17 [53 P.2d 962, 103 A.L.R. 822] ; *Ryan* v. *Walker,* 35 Cal.App. 116, 119 [169 P. 417] ; *Porter* v. *Fisher,* 4 Cal. Unrep. 324 [34 P. 700].) Here the sale price of the personal property was stated to be $600,000 in the final escrow instructions which were signed by McCarty. While the defendant asserts that the separation was made for tax purposes only,

the fact remains that a definite portion of the purchase price was apportioned to the personal property. Thus there was adequate evidence to support the trial court's finding that the sale price of the personal property transferred is severable from the sale price of the real estate, and that the fair value of the services performed by the plaintiff in bringing about the sale of the personal property is $30,150.

The judgment for the plaintiff is modified by striking therefrom the words and figures ''Fifty-seven thousand, five hundred dollars ($57,500),'' and inserting in lieu thereof the words and figures ''Thirty thousand one hundred fifty dollars ($30,150),'' and as so modified the judgment is affirmed.

Gibson, C. J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The majority opinion not only sanctions a palpable fraud, but reaches an absurd result which is the product of fallacious reasoning. After declaring that there is ample ''evidence to support the finding of the trial court that the plaintiff was employed as a broker on commission in the sale of the real and personal property known as the Beverly-Wilshire Hotel,'' and that ''there was also evidence from which the court could properly find that the plaintiff was the procuring cause of the sale,'' it further declares that while the contract between the owner and purchaser for the sale of both the real and personal property is indivisible, the contract for the payment of a commission on such sale is divisible, and that plaintiff may, therefore, recover a commission on the sale of the personal property but not on the sale of the real property. In my opinion, there is no basis in reason, common sense, or sound legal philosophy for such holding. It cannot be denied that the same proof which established plaintiff's right to a commission on the sale of the personal property is applicable to the sale of the real property. In fact, the sale of both the real and personal property was but a single transaction. There is nothing in the record to indicate that either would have been sold separately. Of course, the amount of the purchase price of each would have to be specified in the contract of sale or escrow instructions in order to determine the amount of the revenue stamps to be placed on the deed and the amount of profit or loss for income tax purposes. In view of the fact that the Beverly-Wilshire Hotel was a going concern at the time of the sale, it must be assumed that the personal prop-

erty would not have been sold separately from the real property. Furthermore, plaintiff's "exhibit #4" shows that the major portion of the purchase price of the property listed (almost four-fifths) was for the real property and that the sale of the personal property was merely incidental to the sale of the real property. In view of this situation, the majority opinion postulates a legalistic paradox by holding that under the documentary evidence presented in this case plaintiff may recover a commission on the sale of the personal property, and in the same action be denied recovery of a commission on the sale of the real property, notwithstanding the fact that the documentary evidence applies with equal probative force to both the real and personal property.

The result reached by the majority in this case permits what has always been condemned, namely, the use of the statute of frauds as an instrument for the perpetration of a fraud rather than as a shield against fraud. It is conceded, and there is no room for dispute on the subject, that defendant agreed to and did employ plaintiff to procure a purchaser for both the real and personal property, consisting of the Beverly-Wilshire Hotel, its furniture and equipment, and agreed to pay a commission on the sale of both, yet defendant is permitted to hide behind the statute of frauds, insofar as the real property is concerned, and escape its just obligation.

As I see the situation, it is as follows: The evidence shows and the court found, that prior to April 17, 1944, defendant was the owner of real property known as the Beverly-Wilshire Hotel, and personal property consisting of the furniture and equipment therein; that on October 13, 1943, and thereafter until November, 1944, plaintiff was employed, by agreement with defendant, as a broker to sell the real property for $1,-750,000 and the personal property for $500,000 for which he was to receive a commission of $57,500; that the agreement was evidenced and supported by written notes and memoranda authenticated and subscribed by defendant, thus denying defendant's defense of the statute of frauds; that pursuant to that agreement, plaintiff procured a purchaser (Kirkeby Hotels, Inc.) for the property who bought the property at the prices above mentioned.

The chief issue is whether recovery should be denied by reason of the statutes which provide that: "An agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation or a commission" is invalid unless it or some note or memorandum thereof is in writing.

(Civ. Code, § 1624(5), Code Civ. Proc., § 1973(5).) Defendant's real contention is that the evidence is not sufficient to support the finding of an agreement because there was no note or memorandum sufficient to satisfy the statute of frauds.

Turning to that contention, the following appears: In October, 1943, defendant was the owner of the real and personal property here involved. Plaintiff was a licensed real estate broker. He was introduced to McCarty at that time by O'Neill, the manager of the Beverly-Wilshire Hotel. McCarty told him the hotel was for sale for $2,000,000, and the commission would be 5 per cent. Plaintiff said he wished to work on the deal and had O'Neill show him the hotel and furnish financial statements of the business. Either at that meeting or one shortly thereafter McCarty gave plaintiff two typewritten sheets (plaintiff's Exhibit No. 3) headed: "Re Beverly-Wilshire Hotel—October 14, 1943," followed by a description of the property, the sale price and terms, and provisions for an escrow. McCarty in his testimony described those papers as a *"listing" of the property* like he had given to many brokers, and stated that he *listed* the property with plaintiff and would pay him a commission of 5 per cent on the first $50,000 and 2½ per cent on the balance. Plaintiff contacted various persons to form a syndicate to buy the hotel including Mr. Kirkeby (to whom the property was ultimately sold). He had at least weekly conferences with McCarty in regard to the matter. In February, 1944, McCarty told plaintiff the price was raised to $2,250,000 and that he could work on it at that price. At that time McCarty gave plaintiff a carbon copy of a typewritten writing (plaintiff's Exhibit No. 4) headed with a picture of the hotel followed by printing, reading: "The Beverly-Wilshire Hotel, Walter G. McCarty Corporation, Wilshire Blvd. between El Camino and Rodeo Drives, Beverly Hills, California." Thereafter followed in typing the date (Feb. 15, 1944), the price of the hotel fixed at $2,250,000, and the terms of sale thereof, with other items such as stock inventories to be paid for in cash and an offer of an option on other mentioned property, and finally: "Commission on hotel property $57,500.00. (5% on first $50,000 2½% on $2,200,000.00) Will pay commission on optioned property if exercised." As related by plaintiff the conversation between McCarty and him at that time was: ". . . I said to Mr. McCarty, 'I am surprised that you are raising the price of the hotel when we are having so much difficulty in making the sale at two million dollars.' He said that was

the price, and that they would have to take it or leave it. I said, 'All right. I believe I will still work on the thing and that I can still make the sale, and I think I have the one buyer in the United States who will buy the hotel.' I looked down further in the document [plaintiff's Exhibit No. 4] and I found he had changed the commission to $57,500.00, and I said, 'Mr. McCarty, we have had an agreement all the time that I was to receive five per cent commission on the sale of this hotel.' He said, 'Well, other brokers are willing to work on it for $57,500.00. Maybe if you worked on it, you might get a little more, but that is the price, $57,500.00.' . . . I said to him, 'Well, it seems a little hard on me to raise the price of the hotel and make the deal harder for me to make, at the same time cutting my commission from the hundred thousand dollars which I had hoped to make to fifty-seven thousand five hundred dollars,' but I was not one who could hold back working on a deal because the commission was a question, so long as it was agreed upon that the amount of $57,500.00 net to me. That is all I cared. . . . Mr. McCarty said to me that other brokers were willing to work on this deal on the basis of a business property commission, Los Angeles Realty Board rate.'' *McCarty testified that he ''no doubt gave'' that memorandum to plaintiff and intended to pay a commission to any broker who consummated a deal.* Thereafter plaintiff continued to work on a sale to Kirkeby, according to his testimony, until April when he told McCarty he believed a deal could be closed with Kirkeby but he wanted a written memorandum so there would be no question of the terms. McCarty wrote a memorandum in longhand on a piece of yellow paper (plaintiff's Exhibit No. 10) which he handed to plaintiff. It was headed: ''Kirkeby deal, Walter Marks, Broker.'' Then followed details as to price and terms, and near the end ''. . . commission to Broker $57,500 payable at close of escrow.'' Some alterations were made in the paper by plaintiff with McCarty's consent.

It seems to be the position of the majority that the contract on its face did not show that the defendant's name printed on the heading of plaintiff's ''exhibit #4'' indicated an intent that such heading be an authentication, and that even if it was, the evidence was not sufficient to prove an intent to authenticate. From all of the circumstances, it is obvious that McCarty intended the document (Exhibit No. 4) to be a contract—his memorandum of employment. They show more than merely an intent to contract. They establish that such

memorandum was his way of giving a written listing of the property which was his document and authorized by him. Looking only at those circumstances, we find that: (1) The memorandum was a carbon copy and it *was not McCarty's practice to use a letterhead for carbon copies,* thus indicating that it was used in this case for some special purpose; we may infer the purpose was to adopt the letterhead as his signature—his authentication of the memorandum. At least we cannot say as a matter of law that such an inference is so unreasonable that it could not be drawn by the trial court from the evidence before it. (2) The use of such memorandums by McCarty was, according to his own testimony, for *listing* the property with brokers, that is, *his method of employing brokers,* and that he intended to pay a commission, thus justifying the inference that this memorandum was *his contract* and the letterhead his authentication. (3) The defendant owner-employer is a corporation and customarily its signature would be made by printing or typewriting. To conclude that such evidence is insufficient is to usurp the function of the trial court. *It means that in no case can there be a signature or authentication of a memorandum unless it appears at the bottom or end of the document.* No purpose has been suggested, and none can be within the realm of reason, for the delivery of "exhibit #4" with the letterhead thereon other than that it was intended as the authenticated memorandum of defendant. It is counterfeit logic to argue that defendant intended to contract when he prepared the document (Exhibit No. 4), but did not intend to do that which was necessary to complete the contract, namely, sign such document and thus make it a binding contract. It is wholly reasonable to infer that if McCarty intended to contract, he intended *to make a legally binding contract,* that is, that he intended the letterhead as a signature. In fact, he testified that he *intended to pay a commission,* thus clearly evincing an intent to make a legally binding instrument. If it is not true that he so intended, then the only other inference is that he intended to contract with his "tongue in his cheek"—with the thought that he would not abide by the contract—*that he would defraud the plaintiff.* We should assume that he did not intend to defraud plaintiff, but rather, that he intended to make a legally binding contract and thus intended the letterhead as the signature. Indeed, as before stated, he testified that he intended to pay a commission to brokers with whom he listed the property. In fact, there is a presumption that

compels the foregoing determination of intent. It is presumed that "a person is innocent of crime or wrong," [Code Civ. Proc., § 1963(1)], and that "private transactions have been fair and regular," [Code Civ. Proc., § 1963(19)]. Therefore, it must be presumed that McCarty did not intend to defraud plaintiff by leading him to believe he had a binding contract of employment. Rather it must be inferred that he intended the letterhead to be the signature. At least it can be said that such is not an unreasonable view of the case, and we are bound by the finding of the trial court. Moreover, in connection with the sufficiency of the exhibit, it must be remembered that insofar as a writing is required by the statute of frauds, there are two ways of satisfying the statute, namely, by a formal written contract *or* by a written memorandum which is not the contract but is merely an informal written sketch of the essential terms of the oral agreement between the parties. (Civ. Code, § 1624; Code Civ. Proc., § 1973; *King* v. *Stanley*, 32 Cal.2d 584 [197 P.2d 321]; *Lindley* v. *Fay*, 119 Cal. 239 [51 P. 333]; *Elbert* v. *Los Angeles Gas Co.*, 97 Cal. 244 [32 P. 9]; *Breckinridge* v. *Crocker*, 78 Cal. 529 [21 P. 179]; *Joseph* v. *Holt*, 37 Cal. 250; *Gibson* v. *De La Salle Institute*, 66 Cal.App.2d 609 [152 P.2d 774]; *Derrick* v. *C. W. R. Ford Co.*, 27 Cal.App. 456 [150 P. 396]; Rest. Contracts, §§ 207, 208, 209, 214.)

But we have more in the instant case. We have the positive testimony of McCarty himself. That cannot properly be ignored as does the majority, except by usurping the function of the trial court. McCarty testified: "Q. That is just my point, and that is just why I am asking you, isn't it a fact that contrary to your usual custom of using yellow paper for carbon copies, in this instance you were selling a hotel and you wanted to *authenticate* the memorandum [plaintiff's Exhibit No. 4] which you were giving out to the brokers, so you had the memorandum typed and all the copies of the memorandum typed on your own corporate stationery; wasn't that the reason? A. Well, *that is probably the reason.*"

As I see this case, it involves some important questions of law with reference to the statute of frauds which should be clarified. In connection with the sufficiency of a memorandum to satisfy the statute of frauds, it should be noted that we are speaking of the second method of complying with the statute —a note or memorandum of the contract, rather than a formal written contract (see authorities cited *supra*). There are two objections to the memorandums relied upon (plaintiff's

exhibits above discussed): (1) that they. fail to show the employment of plaintiff as a broker, and (2) that they are not signed by defendant, the party to be charged. Generally in this connection it should be observed that the memorandum required by the statute need not consist of one. instrument but may be made up of several properly connected papers (*King* v. *Stanley, supra*; 12 Cal.Jur. 904).

With reference to the first point, it has been held that a writing given by an owner to a broker which merely states that the former will sell certain property for a certain price, is insufficient because it shows no employment of the broker (*Herzog* v. *Blatt*, 80 Cal.App.2d 340 [180 P.2d 30]; *Sweeley* v. *Gordon*, 47 Cal.App.2d 381 [118 P.2d 14]; *Egan* v. *Pacific Southwest Trust & Sav. Bk.*, 92. Cal.App. 1 [267. P. 719]; *Patterson* v. *Torrey*, 18 Cal.App. 346 [123 P. 224]; *Kleinsorge & Heilbron* v. *Liness*, 17 Cal.App. 534 [120 P. 444]; but see, *Needham* v. *Abbot Kinney Co.*, 217 Cal. 72 [17 P.2d 109]). There need not be a statement that a commission will be paid. (*Toomy* v. *Dunphy*, 86 Cal. 639 [25 P. 130]; *Caminetti* v. *National Guar. Life Co.*, 56 Cal.App.2d 92 [132 P.2d 318]; *Muncy* v. *Thompson*, 26 Cal.App. 634 [147 P. 1178]; *Kennedy* v. *Merickel*, 8 Cal.App. 378 [97 P. 81].) It is also held, however, that where there is an oral agreement employing the broker and the owner gives him a memorandum describing the property and its sale price and providing for the payment of a commission, the memorandum is sufficient. It may be inferred or implied from the provision for a commission in the memorandum, that the broker is employed and authorized to act. (*Moore* v. *Borgfeldt*, 96 Cal.App. 306 [273 P. 1114]; see *Needham* v. *Abbot Kinney Co.*, supra; *Coulter* v. *Howard*, 203 Cal. 17 [262 P. 751]; *Corvin* v. *Smead Investment Co.*, 115 Cal.App. 175 [1 P.2d 507]; *Fritz* v. *Frost*, 114 Cal.App. 602 [300 P. 454]; *Avis* v. *Rebhan*, 92 Cal.App. 178. [267 P. 898]; *Johnson* v. *Krier*, 59 Cal.App. 330 [210 P. 966]; *Carrington* v. *Smithers*, 26 Cal.App. 460 [147 P. 225]; *In re Balfour & Garrette*, 14 Cal.App. 261 [111 P. 615]; *Sanchez* v. *Yorba*, 8 Cal.App. 490 [97 P. 205].) Certainly the implication is irresistible from the provision that a commission is to be paid, that the broker is thereby employed, as commissions are not paid to someone not employed. Insofar as *Egan* v. *Pacific Southwest Trust & Sav. Bank, supra*, and *Morrill* v. *Barneson*, 30. Cal.App.2d 598 [86 P.2d 924]; are contrary to this view, they should be disapproved. *Herzog* v.

*Blatt, supra,* is distinguishable as there was no provision for a commission in that case.

In the instant case the memorandums refer to plaintiff as a broker and make provision for a commission. Taken together these provisions are sufficient to satisfy the statute.

Turning to the statutory requirement that the note or memorandum be subscribed by the person to be charged, it appears (referring to plaintiff's Exhibit No. 4) that it was McCarty's practice to make a memorandum under the letterhead of defendant corporation in listing the property with brokers; that he had so listed it with many brokers; that he did not intend to evade payment of a commission; that he expected to pay one; that the memorandum (plaintiff's Exhibit No. 4) was a carbon copy on the letterhead of the corporation; and that it was not customary to use sheets with the printed heading thereon for carbon copies of general correspondence.

- The law on the subject is well settled. The signature may be typewritten or printed. (*Little* v. *Union Oil Co.,* 73 Cal. App. 612 [238 P. 1066]; Rest., Contracts, §§ 207, 210; Williston on Contracts [rev. ed.], § 585.) The term "subscribed" in the statute of frauds means "signed" and therefore the signature need not be at the end of the document; it may be at any place therein. (*California Canneries Co.* v. *Scatena,* 117 Cal. 447 [49 P. 462]; 12 Cal.Jur. 915-916; 112 A.L.R. 937; Williston on Contracts [rev. ed.], § 585.) It is of course necessary that there be proof that the "signature" was intended as such—as an authentication of the document. (*McNear* v. *Petroleum Export Corp.,* 208 Cal. 162 [280 P. 684]; *Little* v. *Union Oil Co., supra.*) As we have seen, there is evidence in the instant case of such intent.

It is urged, however, that such parol evidence was not competent as it must appear on the face of the instrument itself that the name of the defendant was placed thereon or adopted as his signature or authentication of the document, citing *McNear* v. *Petroleum Export Co., supra,* and *Little* v. *Union Oil Co., supra.* In the McNear case the document showed on its face that the name of the defendant thereon *did not* purport to be an authentication. In the Little case the court had before it an appeal from a judgment of dismissal and the court pointed out that from the allegations of the complaint it was clear that the typewritten name was not intended as a signature. In the instant case we have the significant factors that the writing was a carbon copy, yet

was on the letterhead of defendant. It was delivered to plaintiff as a broker, and it was customary for defendant to list the property for sale with brokers in that manner and in so doing it intended to pay a commission. In the light of these circumstances it cannot be said that it affirmatively appears that the heading was not intended to be adopted as a signature. On the contrary, it is reasonable to infer there was such an intent and McCarty's testimony verified it. Evidence of surrounding circumstances is admissible to explain a memorandum of a contract within the statute of frauds. (*Brewer* v. *Horst & Lachmund Co.*, 127 Cal. 643 [60 P. 418, 50 L.R.A. 240] ; *Towle* v. *Carmelo L. & C. Co.*, 99 Cal. 397 [33 P. 1126] ; *Preble* v. *Abrahams*, 88 Cal. 245 [26 P. 99, 22 Am.St.Rep. 301] ; *Mann* v. *Higgins*, 83 Cal. 66 [23 P. 206] ; *Gibson* v. *De La Salle Institute, supra*; see *King* v. *Stanley, supra*.)

The majority advance the argument that plaintiff was at fault in not procuring a signed agreement for the payment of a commission—that he should have known better—a sort of *in pari delicto* or contributory negligence theory of defense. That argument is indeed unique. What bearing it has upon the sufficiency of the writing (Exhibit No. 4) to meet the requirements of the statute of frauds does not appear. Certainly such writing would be just as invalid, according to the test laid down by the majority, if plaintiff had been illiterate and inexperienced in such transactions. The only possible purpose in injecting such argument into the case is that the majority feel that it tends to ameliorate the harshness of the injustice which this court is inflicting upon plaintiff by means of a strained and tortured application of a salutary principle of law (statute of frauds), which was never intended to be so applied as to produce such a result. It seems to me that it would be much more logical for the majority to argue that plaintiff was fully justified in relying upon the written memorandum on the letterhead of defendant prepared by its president, which covered every detail of the transaction, and that plaintiff had the right to assume that the defendant intended to act in accord with the statements contained in such memorandum—that such memorandum was not delivered to him as a mere idle act or for the purpose of inducing him to render services and incur expenses for which defendant did not intend to reimburse him if he procured a purchaser for the property described therein. In other words, that plaintiff had the right to assume that McCarty's intentions were honorable and not fraudulent. Although the majority

concede that plaintiff so believed and acted, they permit defendant to escape liability by the mere assertion that the record does not show that McCarty intended to authenticate the memorandum and thus make it binding on defendant. This assertion is not justified, and, as I have heretofore pointed out, the record amply supports the finding of the trial court that McCarty intended the name on the letterhead on which the memorandum was prepared to constitute an authentication of the document.

Finally, it is stated in the majority opinion that to hold contrary to the view there expressed would ''repeal'' the statute of frauds. Plainly, there was no fraud or opportunity for fraud on the part of plaintiff, as there is clearly no doubt as to the nature of the contract between the parties here.

The conclusion reached by the majority is based upon a strained legalistic approach to the problem with no regard for considerations of justice or fair dealing. The decision in this case makes a statute, which was designed to prevent fraud, an instrument which may be used to aid unscrupulous persons in the perpetration of fraud, and it is obviously being so used in this case.

For the foregoing reasons, I would affirm the judgment as rendered.

Appellant's and respondent's petitions for a rehearing were denied June 9, 1949. Carter, J., voted for a rehearing.